.CHANDLER, Justice,
for the Court:
¶ 1. After this Court ordered a new trial, Brian Holliman was retried in the Circuit Court of Lowndes County for the murder of his wife. Holliman v. State, 79 So.3d 496 (Miss.2011). The jury found Holliman guilty of first-degree murder, and the trial court sentenced him to life in the custody of the Mississippi Department of Corrections. He appeals, asserting that (1) the evidence of deliberate design was insufficient to support the verdict, (2) the jury instructions Were improper, (3) the trial court erroneously admitted hearsay statements made by the victim, (4) the trial court erroneously denied a motion to suppress his two written statements, and (5) the trial court erred by denying his motion to quash the indictment.
¶ 2. Finding no error, we affirm.
FACTS
¶ 3. Holliman' lived with his wife, Laura Lee Holliman, and Laura’s fourteen-year- *695 old sister, Katie Godfrey, in Caledonia, Mississippi. At 4:01 p.m. on October 25, 2008, Holliman placed an emergency 911 call and reported that his wife had shot herself. He told. the. 911 operator that he had been in the back yard playing with his two small children and stepchild when he heard a loud sound and ran inside to find Laura dead in a pool of blood.
¶ 4. Lieutenant Steve Hatcher with the Lowndes County Sheriffs Department was the first to arrive on the scene. He discovered Laura lying on the floor of her bedroom with her feet inside the closet and her head pointed toward the bed. Laura’s right arm was. draped over the side of her face, and the tip of a twelve-gauge Remington 870 shotgun was pushed underneath her. chin. Holliman told Hatcher that his fingerprints were on the gun because he had moved Laura’s arm and the gun to check for a pulse. Bloody footprints led from, the bedroom to a door in the living room leading to the back yard. Hatcher testified that Holliman appeared to be acting like he was crying, but that he had no tears in his eyes.
115. Ben Kilgore, the town- marshall, was the next to arrive. Holliman told Kilgore that he and Laura had been having some problems, but that they had worked them out. Holliman also told Kil-gore that Laura had been sick, and, due to her illness, he had removed all the guns from the house. He said he had forgotten to remove the shotgun he kept under the. bed. Kilgore corroborated Hatcher’s observation that Holliman had few tears.
¶ 6. Eli Perrigin, the-detective assigned to the case, testified that' he spoke with Holliman upon his arrival. Holliman was crying and mumbling, and told him Laura had been having health problems and had said she wanted to “take the easy way out.” Holliman said her statements had prompted him to remove all the guns from the house, but he had forgotten to remove the shotgun he always kept under the bed with one shell in the chamber and the safety off. When Perrigin moved Laura’s body, he discovered a shotgun wound on the left side of her face. He also observed that the ring finger of her right hand had been blown backwards .and was attached by a piece of skin. Perrigin testified that the ring finger had a black mark on it that was consistent with the choke on the shotgun. Perrigin also testified that the shotgun was unloaded, but one spent hull was in the chamber.
¶7. Holliman agreed to come to the sheriffs office' to give a statement, in which he described the death as a suicide. Three days later, Perrigin returned to the crime scene and discovered a gun cabinet in the bedroom1 that had not been visible previously because it was located behind the open closet door. The gun cabinet contained two rifles, a shotgun, and a box of twelve-gauge shells. Perrigin 'testified that, due to the autopsy results and the discovery of the guns, he asked Holliman to return to the sheriffs office.
¶8. Holliman gave another statement at the sheriffs office at 5:00. p.m. on October. 28 in which he admitted that he had shot Laura. In this statement, Holliman said that he and. Laura had been “fussing” about where Laura planned to go. Later, he noticed his shotgun in the corner, which was unusual because he normally kept it under, the bed or. mear the gun cabinet. He became concerned that Laura would commit suicide due to her previous statements, and he picked up the gun. He stated that this shotgun always had one shell in the chamber and the safety off. Holliman said he heard rattling in the closet and discovered Laura inside the closet on her cell phone. .According to his statement,
*696 I told her this is not going to happen. In the process of talking I was bringing the gun down leveling it off with both hands pointed toward her. The barrel touched her upper body and she grabbed hold of the barrel. She pushed the barrel away from her and the gun went off. I didn’t mean to pull the' trigger and didn’t realize my finger was on the trigger.
Holliman stated that he moved the gun to stage a suicide because he “didn’t want people to think that I shot her.”
¶9. Holliman was arrested the next day. Later that night, Holliman asked to speak to Perrigin, and he gave a third statement after waiving his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 16.02, 16 L.Ed.2d 694 (1966). This time,, Holliman said “[o]n purpose, I pointed the gun at Laura to scare her to tell me where she was going.” As he was lowering the gun, Laura “shocked up and it hit her in the upper body. Laura was standing about 2 foot from, me and the end .of the barrel was touching her. I don’t remember how she did it, but I remember she hit the gun and I was jarred and the gun went off.”. Because he was worried that.“even if it was an accident, I was going to get locked up,” he moved the gun and touched Laura’s finger to- the trigger. Holliman also stated that, the night before- her death, Laura had told him she had contacted a lawyer about a divorce.
¶ 10. The medical examiner, Dr.- Lisa Funte, testified that she had found that' the cause of death was a shotgun wound to; the head and the manner of death was homicide. She found that the linear depo--sition of soot on the right ring finger showed the finger was next to or touching the gas vent at the time the gun discharged. Dr. Funte also found abrasions and lacerations to the back of the right hand, consistent with pushing or striking the gun away or grabbing the end of the gun. "She testified that Laura’s -face wound was an intermediate-range wound, meaning that the gun was a few inches to several- feet away when it was fired. Dr. Funte testified- that Laura’s injuries were inconsistent with suicide.
¶ 11. Steve Byrd, a firearms analyst at the Mississippi Crime Laboratory, testified that test firings of the shotgun showed that it needed four-and-a-half-to six-and-a-half pounds of pressure to fire. - Byrd testified that the shotgun did not have a “hair trigger.” Byrd also testified that the shotgun did not fire during a three-foot drop test from any angle. However, Byrd stated that, if someone had a finger on the-trigger of the shotgun with the safety off while pointing it at another person, and that person pulled on the muzzle, it could cause unintentional- discharge.
¶ 12. Various witnesses testified about the events preceding Laura’s death. Laura’s sister, Katie, testified that Holliman and Laura often argued. She testified that, on October 20, Holliman told her that he had a $100,000 life insurance policy on Laura. He said that Laura was unaware of the policy and that “if she died, she doesn’t know about it.” Katie testified that, about a week before the shooting, the couple had an argument and Laura began packing her car with clothes from the closet.- Katie walked into the bedroom and saw Holliman lock Laura inside the closet, and Laura screamed for him to let her out. Holliman’s mother arrived and kept the children in the car until the couple settled down. Katie testified that Laura had health .issues including migraine headaches, shingles, and a planned bladder surgery.
¶ 13. According to Katie, on the morning of October 25, 2008, Katie and Laura went to a pee-wee football game where Laura was coaching pee-wee cheerleaders. *697 Laura’s friend,- Lee Anri Tucker, was at the game. Holliman also attended the game and stood 'at the fence yelling for Laura to leave the field and talk to him; Laura ignored him. That afternoon, Holli-man talked to Katie alone and said he could tell it was over between them. Then Katie went to talk to' Laura in the bedroom, and Holliman- came in. He was hysterical and “fake crying.” He demanded that Katie leave and handed her his car keys, although she had no driver’s license or permit. Katie left, but realized she had forgotten some items and called Holliman. He said she did not have to come inside, and that he would place Katie’s items in Laura’s car. When Katie returned for the items, one of the children was in the front yard alone, so she put her in the fenced back yard. She did not see Holliman. Shortly thereafter, she was notified that ambulances were at her house. After the shooting, Katie saw Holliman at his parents’ house. Katie testified that Holliman was crying but'did not seem sincere.
¶ 14. Tucker testified that, early that week, she had seen a bruise, on Laura’s arm and Laura had told her that Holliman had locked her in the closet the night before. At the football game, .Laura told Tucker that she had given Holliman divorce papers that morning. When Holli-man arrived, he asked Tucker if she knew Laura had given him divorce papers, and emphatically stated that he . did not want a divorce and.that he would not get a divorce, “period.” Tucker observed Holli-man yelling for Laura to come, talk to him during the game and that Laura ignored him and did not answer her cell phone when he called numerous times.
¶ 15. Another friend, Angela Jones, testified that Laura called her at 3:56 p.m., five minutes before Holliman called 911 to report the shooting. ■ Laura said that she was in her closet, and that “Brian was being a butt.” Laura told Jones she planned to go to a friend’s house in Sulli-gent, Alabama, to watch- a football game. Jones testified that Laura sounded upset and did not say goodbye when she hung up. Tucker and Jones both testified that Laura had never seemed depressed or suicidal.
• ¶ 16. The jury was instructed on first-degree murder, second-degree murder, heat-of-passion manslaughter, and culpable-negligence manslaughter. The jury found Holliman guilty of first-degree murder.
LAW AND ANALYSIS
I. WHETHER THE TRIAL COURT ERRED BY DENYING HOLLI- ■ MAN’S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT (JNÓV):
¶ 17. Holliman argues that the trial court erred by denying his motion for JNOV that challenged the sufficiency of the evidence. On review of a claim that the evidénce was insufficient to support the verdict, “the critical inquiry is whether the evidence shows ‘beyond a reasonable doubt that accused committed the act charged, and that he'did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test' it is insufficient to support a conviction.’ ” Bush v. State, 895 So.2d 836, 843 (Miss.2005). This Court does not ask whether it believes the evidence was sufficient to support the verdict. Id. Rather, “the relevant question is whether, after viewing, the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Id. (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). If “ ‘reasonable fair-minded [jurors] in the exercise of *698 impartial judgment might reach different conclusions on every element of the offense,’ the evidence will be deemed to have been sufficient.” Bush, 895 So.2d at 843 (quoting Edwards v. State, 469 So.2d 68, 70 (Miss.1985)).
¶ 18. The jury found Holliman guilty of first-degree murder. Mississippi Code Section 97-3-19(l)(a) provides that “[t]he killing of a human being without the authority of law .by any means or in any manner shall be murder in the following cases: (a) when done with deliberate design to effect the death of the person killed, or of any human being_” Miss. Code Ann. § 97-3~19(l)(a) (Rev.2014). Holliman argues that the State did not present sufficient evidence of deliberate design, and that a rational jury could have found him guilty of, at most, culpable negligence manslaughter. He argues that no evidence contradicted, his statements to the police in which he admitted that he pointed the loaded shotgun with the safety off. at Laura, and that the shotgun discharged accidentally when she knocked it with her hand. Holliman contends that the forensic evidence supported this version of events. He points to Dr. Funte’s testimony that the injuries to Laura’s ring finger and hand were consistent with her having slapped the gun. He also points to Byrd’s testimony that the gun could have discharged accidentally if Holliman’s finger was on the trigger and Laura pulled on the shotgun.
¶ 19. “This Court has held that ‘[ujnless one expresses his intent, the only method by which intent may be proven is by showing the acts of the person involved at the time, and by showing the circumstances surrounding the incident.’ ” Boyd v. State, 977 So.2d 329, 335 (Miss.2008) (quoting Thompson v. State, 258 So.2d 448 (Miss.1972)). “Deliberate design” is synonymous with “malice aforethought” and connotes an intent to kill. Wilson v. State, 936 So.2d 357, 868-64 (Miss.2006). “[Deliberate design >to kill. a person may be formed very quickly, and perhaps only moments before the act of consummating the intent.” Jones v. States 154 So.3d 872, 880 (Miss.2014) (quoting Gossett v. State, 660 So.2d 1285, 1293 (Miss.1995)). It is well-established that “[m]alice, or deliberate design, may be inferred from the use of a deadly weapon.” Anderson v. State, 79 So.3d 501, 507 (Miss.2012) (quoting Phillips v. State, 794 So.2d 1034, 1037 (Miss.2001)). “[D]eliberate design, as a matter of-law, may be inferred through the intentional use . of any instrument which based on its manner of use, is calculated to produce death or serious bodily injury.” Childs v. State, 183 So.3d 848, 352 (Miss.2013) (quoting Wilson, 986 So.2d at 864).
¶20. Holliman argues that this case parallels Tait v. State, 669 So.2d 85 (Miss.1996), in which this Court held that the evidence was insufficient to support a murder verdict. In Tait, a witness saw Tait and his friend playing with a gun, when Tait cocked it and put it to his friend’s head, and it went off. Id. at 87. Immediately, Tait fell to the ground, sobbing and saying, “I killed him.” Id. Finding that the evidence did not support the crime of depraved-heart murder, this Court reversed Tait’s murder conviction and affirmed a conviction for culpable-negligence manslaughter. Id.- at 91. Depraved-heart murder, now “second-degree murder,” is a killing “done in the commission of an act eminently' dangerous to others and evincing a depraved heart, regardless of 'human life, although -without any premeditated design to effect the death of any particular individual — ” Miss.Code-Ann. § 97-3-19(1)(b) (Rev.2014). Depraved-heart murder encompasses “a reckless and eminently dangerous act directed toward a single individual,” from which *699 malice is implied. Tait, 669 So.2d at 88. The Court found that the evidence did not support the conclusion that Tait had acted with that degree of, recklessness when he put the gun to the victim’s head and cocked it. Id. at 90. Instead, the Court found that Tait’s falling to the ground and crying after he shot the victim was consistent with an accident. Id. However/ the Court held that, even if the discharge was accidental, Tait’s actions of pointing a loaded gun at another individual supported a conviction of manslaughter bécause those actions “show' a conscious, wanton and reckless disregard of the likely fatal consequences of his willful act which created an unreasonable risk.” Id. at 89-90 (quoting Jernigan v. State, 805 So.2d 353, 354 (Miss.1974)). The Court affirmed a eonvie? tion of culpable-negligence manslaughter. Tait, 669 So.2d at 90.
¶ 21. Holliman also argues .that the evidence in this case mirrors the evidence in several other eases in which the Court affirmed convictions of culpable-negligence manslaughter. For example, he cites Burge v. State, 472 So.2d 892, 896 (Miss.1985), in which the defendant, during an argument with a victim who was armed with a knife, pulled out his gun and cocked it. The gun discharged when the victim hit it with her hand, and the defendant tried to rush the victim to the hospital. Id, at 894. This Court found the evidence sufficient to support a conviction of culpable-negligence manslaughter, because Burge drew a gun, cocked it, and aimed it at the victim, manifesting “reckless indifference to human life.” Id. at 396. Holli-man also cites I'amigan, in which the defendant claimed he thought the gun was empty, that he and the victim often pranked each other, and that the gun fired accidentally when he pulled it out of his shirt pocket. Jernigan, 305 So.2d at 353. The Court found the evidence sufficient to support Jemigan’s conviction of culpable-negligence manslaughter. Id. Holliman cites Strode v. State, 406 So.2d 820, 821-22 (Miss.1981), in which the defendant, thinking a gun was unloaded, pointed the gun at the victim and pulled the trigger, and the Court affirmed the jury’s, verdict of culpable-negligence manslaughter. Holliman also cites Bruce v. State, 349 So.2d 1068, 1070 (Miss.1977), in which evidence that a death that occurred during a drunken game- of “Russian roulette" supported the verdict of culpable-negligence manslaughter.
¶ 22. In Burge, Jernigan, Strode, and Bruce, the Court simply found that the evidence sufficiently supported the verdicts of culpable-negligence manslaughter. The Court did not find that that culpable-negligence manslaughter was the only possible verdict when someone points a loaded gun at,another and claims that the gun discharged accidentally. If‘sufficient evidence exists that the shooter pulled the trigger with intent to -kill, then the killing is first-degree murder. Miss.Code Ann. § 97-3-19(1)(a) (Rev.2014). In fact, in Bruce and Jemigmi, the defendants were tried for murder, but the juries rejected the evidence of deliberate design and- returned verdicts of culpable-negligence manslaughter, which the Court affirmed. Bruce, 349 So.2d at 1069-70; Jernigan, 305 So.2d at 858-54. And in Tait, where the Court did find that culpable negligence was the'only possible verdict, there-was no evidence of deliberate design. Tait, 669 So.2d at 90. Although Tait used a deadly weapon, all the evidence showed the shooting was accidental because Tait and the victim had been engaged in horseplay. Id.
¶ 23. In this case; the :State presented copious evidence that,Holliman had harbored deliberate design to kill when he shot Laura. Holliman and Laura were not engaged in friendly horseplay When the shooting occurred. Rather, Laura had asked Holliman for a divorce that morning, *700 and Holliman was angry. Several witnesses- observed Holliman angrily yelling at Laura at the football game. Holliman told Tucker that he would not agree to a divorce. Katie observed the couple arguing at home after 'the football game. Hol-liman made sure1 Katie was gone and the children were outside before the shooting occurred. He admitted that, when he pointed the gun at Laura, he was upset because he did not know - where she planned to go. Mere moments after Holli-man shot Laura, he moved the gun and body to stage a suicide and called 911 to report Laura’s suicide. One week prior, Holliman had locked Laura in the closet during an explosive argument. Although the forensic evidence was consistent, with Holliman’s story that the gun went off when Laura struck, it with her hand, the jury reasonably could have found that Hol-liman shot Laura intentionally and the injuries to her hand occurred when she was trying to avoid being shot. The jury reasonably could have found that Holliman’s actions in staging and reporting a suicide were an attempt to cover up an intentional killing, not an accident. While Holliman said in his- statement that he pointed the shotgun at. Laura with the intent to scare her and the shooting was accidental, a rational jury could have found that Holli-man pointed a- loaded shotgun with the safety off at Laura and pulled the trigger with the intent to kill her. Viewing the evidence in the light most favorable to the verdict, -a rational jury could have found the elements of first-degree murder beyond a reasonable doubt.
II. WHETHER THE TRIAL COURT • COMMITTED ' REVERSIBLE ERROR BY FAILING TO PROPERLY INSTRUCT THE JURY.'

A. Malice-Aforethcmght Instruction

¶24. The trial court gave-instruction S-3 on malice aforethought:
The Court instructs the Jury that the term “malice aforethought” as used in these instrtictions means intent to kill without authority of law and not being legally justifiable, legally excusable or under circumstances that would reduce the act to a lesser crime. Malice aforethought cannot be formed at the very moment of the fatal act; however, malice aforethought need not exist in the mind of the Defendant for any definite period of time. If there is malice aforethought, it exists in the mind of the Defendant but for an instance before the fatal act, this is sufficient malice aforethought to constitute the offense of First-Degree Murder.
Holliman argues that the jury instruction is fatally defective because it instructed the jury that malice aforethought could be formed “but for an instance before the fatal act.” Holliman did not object to the instruction on this ground at trial. Due to the lack of a specific objection to the instruction, this issue is procedurally barred. Fears v. State, 779 So.2d 1125, 1127 (Miss.2000).
¶ 25. Notwithstanding the procedural bar, the issue is without merit. Hol-liman argues that instruction S-3 told the jury that malice aforethought could be formed at the moment of the fatal act, which has been condemned by numerous cases, including Windham v. State, 520 So.2d 123 (Miss.1987). In Windham, the jury was instructed that deliberate design could be formed “at the very moment” of the fatal act. Id. at 125. The Court held that, while intent to kill may be formed very rapidly, perhaps moments before the fatal act, it could not be formed “at the very moment” of the fatal act. Id. at 126. This is because “deliberate design” indicates full awareness of what one is doing, *701 implying careful or unhurried consideration of the consequences, pluSiCalcúlation, planning, or contemplation. Id. Further, the Court held that-the instruction conflicted with the heafr-of-passion manslaughter instruction because, in manslaughter, >thé intent to kill is formed “from a sudden passion induced by insult, provocation ■ or injury from another.” Id. at 127.
¶ 26. The problem with Holliman’s invocation of Windham ⅛ that instruction S-3 did not state that malice aforethought could be formed at the very moment of the fatal act. To the contrary, instruction S-3 stated that “[mjalice aforethought cannot be formed at the very moment of the fatal act.” The instruction does state that malice aforethought could “éxist[ ] in the mind of the Defendant but for an instance before the fatal act.” That statement did not render the instruction erroneous, because this Court has approved of instructing the jury that deliberate design may be formed “but for an instant before the fatal act.” Fears, 779 So.2d at 1127-28; Theodore v. State, 798 So.2d 465, 470 (Miss.2001). Instruction S-3 "was a proper jury instruction.

B. Second-degree Murder Instruction

¶ 27. Instruction S-4, on second-degree (depraved-heart) murder, stated, in pertinent part:
The Court instructs the Jury that if you find from the evidence in this case beyond a reasonable doubt that the Defendant, Brian Douglas Holliman, did on or about October 25, 2008, in Lowndes County, Mississippi, unlawfully[,] willfully, and feloniously kill Laura Godfrey Holliman, while engaged in the commission of an act eminently dangerous to others and evincing a depraved heart, disregarding the value of human life, whether or not he had any intention of actually killing Laura Godfrey Holliman, by pointing a loaded shotgun with the safety .off at, Laura Godfrey Holliman, without authority of law and. , not in necessary .self-defense, then you shall find the Defendant guilty of Second-Degree Murder.-
Holliman argues that instruction S-4 is fatally defective because it instructed the jury to' presume deliberate design from Holliman’s actions in violation of Reith v. State, 135 So.3d 862 (Miss.2014). But Holliman did not object to instruction on S-4 on the ground he now urges on appeal. Therefore, this issue is procedurally barred. Fears, 779 So.2d at 1127.
¶ 28. Notwithstanding the procedural bar, this issue has no merit. In Reith, the trial court instructed the jury that “[djeliberate design may be presumed from the unlawful and deliberate use of a deadly weapon.” Reith, 135 So.3d at 865. This Court held that this kind of instruction, which allows the jury to presume guilt on an essential element of the offense, is always erroneous. Id. at 866. We stated that such instructions “run counter to our most basic tenet of criminal law,” and “the jury may never be instructed that it may presume deliberate design from the unlawful and deliberate use of a deadly weapon.” Id. at 865, 866. Instructing the jury to presume deliberate design is erroneous because it relieves the State of its burden of proving guilt beyond a reasonable doubt on an essential element of the offense. Id. at 867.
¶29. Unlike in Reith, instruction S-4 did not instruct the jury to presume any element of . depraved-heart murder. Therefore, it did not contravene Reith. Instruction S-4 tracked the language of the second-degree murder statute and it was a proper jury instruction. See Miss. Code Ann. § 97-3-19(1)(b).

*702
C: Closing Argument

¶30. In his argument attacking the jury instructions, Holliman also argues that the State’s closing1 argument shifted the burden of proof to him by the prosecutor’s statement that “people intend the natural consequences of their act.” The prosecutor made this statement while arguing that Holliman had killed Laura with deliberate design. The prosecutor stated:
That thing that we call intent is something that’s rarely susceptible to any kind of direct proof. We’re not able to call an expert that comes up here and says, you know, 'I examined his brain and this is what I looked at, this is what he was thinking on October 25, 2008. You can’t do that. What in all you can do when we’re discussing this thing called intent is look at what he did. That’s the way you prove what somebody intended, by showing what they did,, became.people intend the natural consequences of their act. That being said, Ladies and Gentlemen, malice is written all over this case and all over what happened in that house.
Later, the prosecutor stated:
But there’s more evidence of planning, of malice, of that intent to kill, Ladies and Gentlemen. Because you see he pointed a loaded shotgun that he knew was not safe at another human being. Ladies and Gentlemen, we intend the natural consequences of our act.
¶ 31. Because defense counsel failed to object to these statements during closing argument, this issue is procedurally‘ barred. Flowers v. State, 158 So.3d 1009, 1043 (Miss.2014). And notwithstanding the procedural bar, the issue is without merit. Holliman argues1 that the prosecutor’s statements were akin to the jury instructions found erroneous in Williams v. State, 111 So.3d 620 (Miss.2013). In Williams, the Court found that a jury instruction stating that “a person is 'presumed- to have intended the natural and probable consequences of his voluntary and' deliberate acts” was erroneous because it created a mandatory presumption that shifted the burden- of proof to the defendant. Id. at 624 (emphasis added). But the Court found that the trial court had properly granted jury instructions that, permitted the jury to infer malice aforethought from the use of a, deadly weapon. Id. at 625. These instructions allowed “the jury the discretion to reach a conclusion only if evidence has been presented to support that conclusion, -thus creating a true permissive inference.” Id. Thus, Williams explained the distinction between-instructing the jury on a mandatory presumption, which is improper, and instructing the jury, on a permissive inference, which is proper. Id. at 624-25.
¶ 82. Because' ‘ Williams dealt with jury instructions, not closing arguments, it is inapposite to this case. Because the jury is presumed to follow the judge’s instructions, Moody v. State, 841 So.2d 1067, 1076 (Miss.2008), the prosecutor’s statements cannot be construed as additional jury instructions. Further, the prosecutor’s statements did not ask the jury to presumo delibérate design from Holliman’s use of a deadly weapon. Rather, what the prosecutor said amounted to an argument that the jury could infer Hol-liman’s intent to kill from his use of a deadly weapon and the other evidence. This issue is procedurally barred; notwithstanding the procedural bar, it is without merit.

D. Circumstantialr-Evidence Instruction

¶88. Holliman requested a circumstantial-evidence instruction, which stated that “[i]n order for you to find *703 Brian D. Holliman, guilty of Murder, you must first find him guilty not only beyond a reasonable doubt, but also to the exclusion of every reasonable hypothesis consistent with innocence.” The trial court denied the instruction because a circumstantial-evidence instruction is not . warranted when the defendant has admitted a significant element of the charged offense. Mack v. State, 481 So.2d 793, 795 (Miss.1985). This is because an admission to a significant element <?f the charged offense constitutes direct evidence, and a circumstantial-evidence instruction should be granted only if the evidence is purely circumstantial. Corrothers v. State, 148 So.3d 278, 303 (Miss.2014). . Holliman’s admission that he shot Laura was an admission to the “killing of a human.being” element of the charged crime of first-degree murder. Holliman admits that his admission to shooting Laura constituted direct evidence. But he argues that this Court should require a circumstantial-evidence instruction if intent is the only disputed element and the State’s evidence on that element is circumstantial.
¶ 34. We decline to adopt Hol-liman’s argument. Even when other evidence in a case is direct, the element of intent is usually proven by circumstantial evidence because, unless a defendant expressly states his intent at the time of the crime, intent can be proven only by the act itself and the surrounding circumstances. See Boyd, 977 So.2d at 335, To require a circumstantial-evidence instruction every, time intent is disputed would require a circumstantial-evidence instruction in- virtually every case. But “[o]ur precedent consistently adheres to the rule that any direct evidence presented at trial is sufficient to preclude a circumstantial evidence instruction.” Garrett v. State, 921 So.2d 288, 292 (Miss.2006), “[I]t [is not] unusual for criminal cases to contain some direct evidence and. some circumstantial evidence.” Pettus v. State, 200 Miss. 397, 411, 27 So.2d 536, 540 (1946). We reject Holliman’s proposed rule because it would eliminate any' distinction between a circumstantial-evidence ease and a direct-evidence case.
III. WHETHER THE TRIAL COURT ERRONEOUSLY ADMITTED HEARSAY STATEMENTS BY THE VICTIM.
•¶35. Holliman argues that the trial court' erroneously overruled his hearsay objections and admitted several ■ statements Laura made to others before her death. • We review those statements and the trial court’s rulings.
¶ 36. Holliman made two hearsay objections to Katie’s testimony about statements by Laura. Because the trial court sustained Holliman’s hearsay objection to Katie’s testimony that Laura had told her she had gone’to the hospital after the fight in which she was locked in the closet, that statement is not at issue. The trial court overruled'Holliman’s objection to Katie’s testimony that, when Laura was' taking clothes from her closet and packing them in her ear on the night of that fight, Laura said she was leaving. The trial court overruled-Holliman’s objection to hearsay during Tucker’s testimony that Laura had talked to her about wanting a divorce. After hearing argument outside the presence of the jury, the trial court overruled a hearsay objection to - Tucker’s testimony that Laima had told her that Holliman had locked her in'the closet during a fight and that then she went to the emergency room because she had a migraine. The trial court found that Laura’s statements. to Tucker had. sufficient guarantees.of trustworthiness. to be admissible. Finally, the trial court overruled an objection to Jones’s testimony that, -during their cell *704 phone conversation minutes before Laura’s death, Laura had said she was in the closet.
¶37. “A trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence. Unless the judge abuses his discretion so as to be prejudicial to the accused, the Court will not reverse this ruling.” Green v. State, 89 So.3d 543, 549 (Miss.2012) (quoting Gore v. State, 37 So.3d 1178, 1183 (Miss.2010)).
¶ 38. We find no abuse . of discretion in the admission of Laura’s statement to Katie that she was leaving Holliman. This statement was admissible under the hearsay exception in Rule 803(3), which provides:
Then Existing Mental, Emotional, or Physical Condition. A statement of the declarant’s then existing state of mind, emotion, sensation, or physical condition (such ..as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of the declarant’s will.
M.R.E. 803(3). This statement was evidence of Laura’s existing state of mind and intent as she removed clothing from her closet and put it in her car. Likewise, Laura’s statement to Tucker that she wanted a divorce described her state of mind and intent at the time she made the statement. We observe that Tucker’s testimony was cumulative of Holliman’s statements to Tucker and Perrigin that Laura wanted a divorce.
¶ 39. • The trial court admitted Laura’s statement to Tucker that Holliman had locked her in a closet during a fight upon a finding that the statement was trustworthy under Rule 804(b)(5). That rule states:
The following are not- excluded by the ■hearsay rule if the declarant is unavailable as a witness:
[[Image here]]
[[Image here]]
M.R.E. 804(b)(5). Holliman does not allege that the State faded to give him proper notice under the rule. He argues that the statements lacked “equivalent circumstantial guarantees of trustworthiness.”
¶40. We find that the trial court did not abuse its- discretion in finding that Laura’s statement to Tucker that Hol-liman had locked her in a closet during a fight was trustworthy. This is because Katie testified- that she had witnessed this event occur. And Laura made the statement to Tucker the day after the fight occurred. Tucker’s testimony that Laura had told her she had gone to the hospital for a migraine after the fight is more problematic. As Holliman argues, there was testimony that Laura frequently exaggerated her health problems. But any *705 error in the admission of this statement did not prejudice Holliman; Laura did not state she sought medical treatment because Holliman had injured her in the fight, but rather for a migraine headache. In the absence of prejudice, we will not reverse the trial court’s admission of evidence. Green, 89 So.3d at 549.
¶ 41. We turn to the admissibility of Laura’s statement in her phone conversation with Jones, relating that she was in the closet. Under Rule 803(1), a present-sense impression is excepted from the hearsay rule. A present-sense impression is “[a] statement describing or explaining an event or condition made while the de-clarant was perceiving the event or condition or immediately thereafter.” M.R.E. 803(1). Rule 803(2) provides for the admission of an excited utterance, defined as “[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.” M.R.E. 803(2); Jones testified that Laura had sounded upset during the conversation. Katie testified that, when she left the house just before the shooting, Laura and Holliman had been arguing. And Laura was shot to death in the closet mere moments after telling Jones that she was in the closet. The trial court did not abuse its discretion in admitting Laura’s statement, because it was a present-sense impression or an excited utterance.
IV. WHETHER THE TRIAL COURT SHOULD HAVE EXCLUDED HOLLIMAN’S STATEMENTS.
¶42. Holliman argues that his first two statements to the police were inadmissible because the authorities did not administer Miranda warnings to him before interrogation. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Holliman objected to the admission of the statements at his first trial. He challenged the admission of the statements in his appeal after his first trial, but the Court did not address the issue because the conviction was reversed on other grounds. See Holliman v. State, 79 So.3d 496, 499 (Miss.2011). The State argues that this issue now is procedurally barred because Holliman did hot object to the admission of the statements at the second trial. However, before the second trial, the trial court entered an order that “all prior motions and decisions made in the Lowndes County case, 2009-0112, are adopted in this matter.” Before the first statement was admitted‘at the second trial, Holliman noted the trial court’s order on the record.' The State argues that the trial court’s order did not encompass Holli-man’s objection to the statements. We hold that the trial court’s order adopting “all prior motions and decisions” from the first trial effectively adoptéd its decision to admit the statements.1 Therefore, this is-süe is not procedurally barred.
¶ 43. At the first trial, during Perrigin’s testimony, Holliman objected to the admission of the two statements on the ground that he had not been given Miranda warnings before making them. After a suppression hearing, the trial court held that the statements were admissible because' Holliman had not been in custody when he made the statements. When a trial court has overruled a motion to suppress the confession - of a defendant, this Court will reverse if the ruling was “manifestly in error or contrary to the overwhelming weight of the evidence.” White v. State, 495 So.2d 1346, 1347 (Miss.1986). We also will reverse the admission of a confession if the trial court appliéd an incorrect legal standard. Moore v. State, 933 So.2d 910, 918 (Miss.2006).
*706 ¶ 44. “Under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), custodial interrogation must be preceded by advising the defendant of hi.s right to remain silent and his right to an attorney.” Barnes v. State, 30 So.3d 313, 316 (Miss.2010). But “[fox a non-custodial setting where interrogation is investigatory in nature (general on-the-scene-investigation), Miranda warnings are not required in order that a .defendant’s statements be admissible.” Hopkins v. State, 799 So.2d 874, 878 (Miss.2001) (quoting Porter v. State, 616 So.2d 899, 907 (Miss.1993)). To determine whether an individual was in custody at the time statements were made,
[t]he factors to be considered include the place and. time of the interrogation, the people present, the amount of force or physical restraint used by the officers, the length and form of the questions, whether the defendant comes to the authorities voluntarily, and what the defendant is told about the situation. “The key to determining if the questioning of a person is a custodial interrogation within the meaning of Miranda is whether the defendant is deprived of his freedom of action in any significant manner and whether he is aware of such restraint.”
Hopkins, 799 So.2d at 878 (citations omitted).
¶45. The trial court found that, when Holliman gave his first- statement on the date of the murder, he went to the sheriffs department voluntarily and was allowed to leave. The trial court held, beyond a reasonable doubt, that Holliman was not in custody during the first statement because .the officers merely were investigating a.suicide Holliman had reported. The trial court considered the factors cited in Hopkins to determine whether Holliman was in custody during the second statement. The trial court found that, when Holliman gave his second statement, the police had asked him to come in because they wanted more information from him due to the autopsy results. The trial court found that Holliman’s second statement was not given in an interrogation room, but in the office of one of the officers; Holliman and two deputies were present, and no physical restraint was employed. Further, Holliman voluntarily came to the station and gave the statement and was allowed to leave immediately. The trial court found no evidence had been presented as to the length and form of the questions, but that the officers had told Holliman the reason they had asked for á second interview. After considering' the Hopkins factors, the trial court determined beyond a reasonable doubt that Holliman had not been in custody during the second statement.
¶ 46. Holliman does not challenge these fact findings by the trial court. He provides no argument that the trial court manifestly erred by finding he was not in custody when he made the two statements. He does not argue that this fact finding was against the overwhelming weight of the evidence. Rather, he argues that, because he was a “person of interest” when he gave the statements, Miranda warnings were required. For this proposition, Holliman cites the Court’s recitation of the facts in Barnes, in which the Court stated:
During the hearing on the motion to suppress, Lewis testified that Barnes was not a suspect when he called her and asked her to come to his office for a noncustodial interview. Barnes’ interview ■ was videotaped and later transcribed. .However, Lewis testified that during the. course of the. interview, Barnes made., some. contradictory state-, ments, which are discussedfurther herein, that made her a person of interest *707 At that point, Lewis said Barnes was given her Miranda rights and a waiver. Lewis further testified that Barnes still was not a. suspect at that point, but that he was aware that she had made contradictory statements.
Barnes, 30 So.3d at 317 (emphasis added). Barnes simply recited the facts surrounding Barnes’s statements and that the .police in that case had decided to administer Miranda warnings when they deemed ha? a person of interest. Barnes did hot hold that Miranda warnings are required whenever a-defendant becomes a “person of interest” or a suspect. Rather, the well-established legal standard, articulated in Barnes, is that the warnings are required before the defendant is subjected to custodial interrogation. Id. at 316.
¶47. Holliman also argues that this Court should view the contents of his third statement, given after Miranda warnings, with skepticism, based on Jennings v. State, 127 So.3d 185 (Miss.2013). In Jennings, Eli Perrigin, also the detective in this case, interviewed a sixteen-year-old accused of statutory rape and documented his biographical information on the rights-waiver form. Id. at 188. This Court found from an audio recording of the interview that “when .Jennings corrected Detective Perrigin in regard to the written statements, Perrigin by and large brushed off Jennings’s statements without making most, of the corrections.” Id. at 192. The Court also found that Perrigin had used “arguably overreaching interrogation techniques” and possibly had violated Jennings’s right to silence, which “filled [the Court] with a sense of disquiet” Id. Due to the inadequacy of the record and the trial court’s cursory. denial of Jennings’s motion to suppress, the Court reversed and remanded for a new trial with a new suppression hearing. Id. at 193.
¶ 48. Holliman argues that, due to Per-rigin’s misbehavior in Jennings, a. likelihood exists that similar misbehavior occurred in this case. On .that basis, he urges this Court to find that his- third statement should not have been admitted. Holliman points to his attempts on cross-examination of Perrigin to show that officers added words to his statement and that Perrigin had told him he had to sign a rights waiver to receive a bond, all denied by Perrigin. Holliman also urges, this Court to adopt a rule requiring audio and video recordings of all interviews as a prerequisite to. admissibility absent a good-cause showing by the State.
 ¶49. This issue is procedurally barred because Holliman did not move to suppress his third statement or object to its admission. Rubenstein v. State, 941 So.2d 735, 755 (Miss.2006). Instead of having challenged the third statement’s admission at trial, Holliman now attempts to cast doubt on the weight of that statement before this Court on appeal. That is improper, because the weight and credibility of the evidence is within the sole province of the jury. Taylor v. State, 110 So.3d 776, 784 (Miss.2013). Further, Holliman’s argument that audio and video recording should precondition the admission of a statement should be brought to this Court’s attention in a case where the defendant, has moved to-suppress the statement and a record was . made concerning the facts and circumstances surrounding the statement. This is not such a case, and we domot address the argument.
Y.. WHETHER THE TRIAL COURT ERRED BY FAILING.TO QUASH THE INDICTMENT.
¶ 50. This issue is properly before the Court due to the trial court’s order incorporating all motions and decisions, and the fact that Holliman raised the issue in his *708 initial appeal. ■ Before the first trial, Holli-man moved to quash the indictment on the ground that it had been altered. The trial court held a hearing, and Holliman argued that part of the third line of the indictment’s charging language was blacked out and was not initialed or dated to show that the strike-through was accomplished before the foreman’s signature. The struck language was illegible. The prosecutor stated that:
[T]he statement for the record, that indictment bears my signature, and I can tell you that it is my practice frequently when I’m checking the indictment we’ll have 50 and 60 at a time that are being returned to the clerk’s office. If I. find surplusage or. some error in the indictment that can be corrected merely by me interlining or striking something out, then I do so all before the foreman signs the bill.
The State called Theresa Barksdale, a deputy clerk with the Lowndes County Circuit Court. She testified that the clerk’s office frequently receives indictments returned from the foreman with errors marked out. She testified that, when she received Holli-man’s indictment, the mark-out was on it. But she. was unable to say whether the marking out was done before or after the indictment was presented to the grand jury.
¶ 51. The charging language of the indictment stated that:
BRIAN DOUGLAS HOLLIMAN late of the County aforesaid, did on or about the 25th day of October 2008, in the County and State aforesaid, unlawfully, willfully, and feloniously, with the deliberate design to effect death, did kill and murder a human .being, Laura Godfrey Holliman, without authority of law and not in necessary self-defense, in violation of MCA § 97-3-19; contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the State of Mississippi.
The trial court observed that the indictment correctly charged Holliman with the crime of murder and found the blacked-out language to be surplusage. The trial court overruled Holliman’s motion to quash.
¶ 52. Rule 7.06 of the Uniform Rules of Circuit and' County Court Practice states that: “[t]he indictment upon which the defendant is to be tried shall be a plain, concise and definite written statement of the essential facts constituting the offense charged and shall fully notify the defendant of the nature and cause of the accusation.” URCCC 7.06. An indictment may be amended as to form after its signature by .the grand jury foreman. Rule 7.09 provides that “[a]ll indictments may be amended as to form but not as to the substance of .the offense charged.... Amendment shall be allowed only if the defendant is afforded a fair opportunity to present a defense and is not unfairly surprised.” And “[o]ur precedent establishes that ‘surplusage’ in an indictment may be removed without prejudice to the defendant.” Lee v. State, 944 So.2d 35, 38 (Miss.2006).
¶ 53. Holliman argues that the record is unclear as to whether the language was struck from the indictment before it was' signed by the grand jury foreman;- As the trial court correctly observed, if language is struck from an indictment, the change's should be ■ signed and dated. But in this case, the indictment properly articulated the charged crime of murder. Therefore, we find that the trial court did not err in finding that the blacked-out language was mere surplusage. Because an indictment can be amended to strike surplusage, it is irrelevant whether the blackout occurred after the foreman signed the indictment.

*709
CONCLUSION

¶ 54. For the aforementioned reasons, we affirm Holliman’s conviction and sentence.
¶. 55. CONVICTION OF FIRST-DEGREE MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.
WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ.; LAMAR, KITCHENS, PIERCE, KING AND COLEMAN, JJ., CONCUR.