# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-KA-01042-COA

ANDRE BAKER A/K/A ANDRE ANTONIO-RAPHEAL BAKER A/K/A ANDRE ANTONIO BAKER                                APPELLANT

v.

STATE OF MISSISSIPPI                                APPELLEE

DATE OF JUDGMENT:              02/06/2019
TRIAL JUDGE:                  HON. JON MARK WEATHERS
COURT FROM WHICH APPEALED:     FORREST COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:        OFFICE OF STATE PUBLIC DEFENDER
                              BY: MOLLIE MARIE McMILLIN
ATTORNEY FOR APPELLEE:         OFFICE OF THE ATTORNEY GENERAL
                              BY: SCOTT STUART
DISTRICT ATTORNEY:            PATRICIA A. THOMAS BURCHELL
NATURE OF THE CASE:           CRIMINAL - FELONY
DISPOSITION:                  AFFIRMED - 10/20/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**WILSON, P.J., FOR THE COURT:**

¶1.     Following a jury trial, Andre Baker was convicted of first-degree murder. The circuit court sentenced Baker to life imprisonment. On appeal, Baker argues that the jury's verdict was contrary to the overwhelming weight of the evidence. Finding no error, we affirm Baker's conviction and sentence.

## FACTS

¶2.     On the evening of May 30, 2016, Willie Williams and his cousin, Madison Sims, stopped at a Jr. Food Mart in Hattiesburg. Sims went inside the store to buy cigarettes while

Williams stayed in the car. Sharon Sibley was working at the cash register in the store. While Sims was checking out, Baker approached the counter and asked Sibley for her phone number. Sibley testified that Sims and Baker must have bumped into each other because Baker began asking why Sims had pushed him. Sims denied pushing Baker, but Baker insisted Sims had touched him and began acting more aggressively toward Sims. According to Sibley, Baker repeatedly stated to Sims, "I'm up on you. What you going to do?" Sims tried to avoid the argument, completed his purchase, and left the store.

¶3. Surveillance video from the store captured the discussion between Baker and Sims at the cash register. The video shows Sims attempting to complete his purchase as Baker stood by speaking and gesturing in an increasingly aggressive manner. During the interaction, Baker, who wore a white t-shirt and blue athletic shorts, kept his right hand in the pocket of his shorts. At one point, Baker walked to the door of the store as if to exit. However, before he actually left the store, Baker turned back toward Sims, who was still checking out, and resumed speaking heatedly to Sims. Baker then remained inside the store and waited for Sims to leave before he also left.

¶4. As Sims left the Jr. Food Mart, Baker followed closely behind him. Sibley testified that Baker kept telling Sims, "I'm on your back now. What you going to do?" The Jr. Food Mart's security guard, Victor Chapman, stood at the door and watched the two men leave the store. Surveillance video shows that Baker followed Sims back to Williams's car while Chapman followed both men into the parking lot. Sims handed Williams his purchase from

2

the Jr. Food Mart and walked around the car to the passenger side. Sims and Baker exchanged words again on the passenger side of the car before Sims got into the car.

¶5. Williams also testified that Sims and Baker exchanged words before Sims got into the car. However, Williams did not know what was said. Williams testified that he told Sims to get in the car so they could leave. Baker was standing next to the passenger-side mirror as Sims got into the car. Williams testified that as he tried to put his car in reverse to leave the parking lot, he saw an unknown man running toward his car. Williams stated that as he was watching the unknown man run toward his car, he accidentally put his car in drive instead of reverse. According to Williams, his car lurched forward toward the curb where three people were standing near his vehicle. Williams testified that he did not hit any of the bystanders with his car. Williams testified that as he started to put his car in reverse, he heard a noise that sounded like "a pop, pop, pop."

¶6. The Jr. Food Mart did not have any exterior surveillance cameras. However, one of the store's interior cameras captured a partially obstructed view of the shooting. The video shows Sims getting into Williams's car and Baker standing by the front passenger side of the car. The video also shows two other individuals, later identified as Baker's sister, Carolyn Polk, and Polk's boyfriend, Joshua Speights, approaching Baker and the front passenger side of the car. Consistent with Williams's testimony, the video shows his car lurch forward toward the curb. As the bystanders backed away and the car reversed, the video shows Baker holding a gun in his right hand and pointing it in the direction of Williams's car.

3

¶7.    At trial, Baker called Speights as a witness.[1] Speights testified that at the time of the shooting, he and Polk lived in an apartment across the street from the Jr. Food Mart and that Baker sometimes stayed with them. On the day of the shooting, Speights and Polk were in Speights's truck, and Baker was driving Polk's car. They all stopped at the Jr. Food Mart to buy cigarettes. When Baker exited the store, Polk noticed him arguing with Sims. Speights stated that Polk exited his truck and tried to calm Baker. Speights testified that he also exited his truck and followed Polk. According to Speights, the argument between Baker and Sims appeared to have died down until Williams's car lurched forward. Speights testified that Williams's car made contact with Polk but did not injure her. Speights stated that he heard shots around the same time that Williams's car hit Polk. Speights acknowledged that Baker owned a "9-millimeter" black gun at the time of the shooting. Speights testified that he did not see the gun in Baker's possession prior to the shooting and did not actually see Baker fire a gun. However, on cross-examination, Speights conceded that he believed that Baker shot at Williams's car. Speights stated that the sound of the gunshots frightened him and that he and Polk got back into his truck and drove to their apartment. Speights testified that Baker never returned to the apartment after the shooting.

¶8.    Following the shooting, Williams saw that Sims had been shot in the neck. Williams stopped his car and walked around to the passenger side to check on Sims. Sibley had heard

---

[1] Baker also called Polk as a witness, but Polk asserted her Fifth Amendment right to remain silent.

the gunshots from inside the Jr. Food Mart and walked out to the parking lot. Sibley, who also worked as a registered medical assistant and phlebotomist, saw that Sims was the only injured person. She went to Williams's car to try to help and found that Sims still had a pulse. Although 911 had been called, Williams did not want to wait for medical assistance to arrive. Williams got back in the car and drove toward the hospital while Sibley sat in the front passenger seat of the car to apply pressure to Sims's wound. On the way to the hospital, Williams collided with another vehicle, and both he and Sibley were injured. Sims died from his gunshot wound.

¶9. Dr. Mark LeVaughn, the Chief Medical Examiner for the State of Mississippi, performed the autopsy and testified that Sims's death was caused by the gunshot wound to his neck. Dr. LeVaughn testified that the bullet entered Sims's neck on the right side behind Sims's right ear and then exited Sims's neck on the left side. Dr. LeVaughn testified that Sims did not suffer any other injuries that caused or contributed to his death.

¶10. Jeff Byrd, a crime scene investigator for the Hattiesburg Police Department, photographed the crime scene and collected evidence, including a bullet and three shell casings found outside the Jr. Food Mart. Byrd testified that two of the shell casings were "9-millimeter Luger RP shell casings" and that the third shell was a "9-millimeter Luger Winchester shell casing." Byrd also photographed Williams's car at the scene of the wreck and observed a bullet hole in the front passenger seat where Sims had been sitting. Byrd testified that the bullet that made the hole had entered the passenger seat from the direction

5

of the front passenger-side window and had then traveled toward the back of the car behind the driver's seat.

¶11.    Lieutenant Latosha Myers-Mitchell of the Hattiesburg Police Department assisted with the investigation of the shooting.  A few days after the shooting, Myers-Mitchell showed Sibley a six-person photo lineup.  Sibley identified Baker as the man who argued with Sims prior to the shooting.  The State introduced the photo lineup into evidence at trial. Myers-Mitchell also interviewed Chapman.  Chapman told her that "he heard five shots fired by the guy with the white shirt, referring to Mr. Andre Baker."

¶12.    Myers-Mitchell testified that there was no evidence to suggest that anyone other than Baker fired a gun during the incident.  Myers-Mitchell also testified that she found no evidence that Williams's car actually struck Polk when the car lurched forward.  According to Myers-Mitchell, Polk would have been protected by concrete barriers that were located directly in front of Williams's car in the parking lot.  In addition, Myers-Mitchell saw Polk the day after the shooting, and Polk did not appear to have any injuries.

¶13.    Baker was indicted for first-degree murder, and his case proceeded to trial.  The jury found Baker guilty of first-degree murder, and the circuit court sentenced him to life imprisonment. Baker filed a motion for judgment notwithstanding the verdict or a new trial, which was denied, and a notice of appeal.

**ANALYSIS**

¶14.    Baker's only argument on appeal is that the trial judge abused his discretion by

6

denying Baker's motion for a new trial. Baker argues that the jury's verdict was against the overwhelming weight of the evidence because the evidence shows, at most, that he killed Sims in the heat of passion, not with deliberate design. Therefore, Baker argues he is guilty of, at most, manslaughter, not first-degree murder.

¶15. A motion for a new trial "challenges the weight of the evidence." *Little v. State*, 233 So. 3d 288, 291 (¶16) (Miss. 2017). We review the trial judge's ruling on a motion for a new trial only for an abuse of discretion. *Id.* at 292 (¶21). "Our role as appellate court is to view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.* at 289 (¶1). Moreover, we do not "assume[] the role of juror on appeal. We do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Id.*

¶16. To convict Baker of first-degree murder, the State was required to prove that he killed Sims "without the authority of law" and "with deliberate design to effect" Sims's death. Miss. Code Ann. § 97-3-19(1)(a) (Rev. 2014). "Deliberate design" simply "connotes an intent to kill." *Holliman v. State*, 178 So. 3d 689, 698 (¶19) (Miss. 2015). "Deliberate design may be formed very quickly, and perhaps only moments before the [fatal] act . . . ." *Bowser v. State*, 182 So. 3d 425, 430 (¶12) (Miss. 2015) (quotation marks omitted); *see also Holliman*, 178 So. 3d at 701 (¶26) (stating that "deliberate design may be formed but for an

7

instant before the fatal act" (quotation marks omitted)). In general, a person's intent may be "demonstrated by the act itself, surrounding circumstances, and expressions made by the actor with reference to his intent." *Adams v. State*, 291 So. 3d 405, 409 (¶11) (Miss. Ct. App. 2020) (quotation marks omitted). "Indeed, a jury may infer guilty intent when considering the totality of the circumstances." *Thomas v. State*, 277 So. 3d 532, 535 (¶13) (Miss. 2019). Moreover, "[i]t is well-established that . . . deliberate design[] may be inferred from the use of a deadly weapon. Deliberate design, as a matter of law, may be inferred through the intentional use of any instrument which based on its manner of use, is calculated to produce death or serious bodily injury." *Holliman*, 178 So. 3d at 698 (¶19) (brackets, citations, quotation marks omitted). Ultimately, the "[i]ntent to . . . commit a crime is . . . a question of fact to be gleaned by the jury from the facts shown in each case." *Shanklin v. State*, 290 So. 2d 625, 627 (Miss. 1974).

¶17. A homicide will be downgraded from murder to manslaughter if it was committed "without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense." Miss. Code Ann. § 97-3-35 (Rev. 2014). A "heat of passion" is "[a] state of violent and uncontrollable rage engendered by a blow or certain other provocation." *Jones v. State*, 39 So. 3d 860, 866 (¶36) (Miss. 2010) (quoting *Mullins v. State*, 493 So. 2d 971, 974 (Miss. 1986)). The "[p]assion or anger [must be] suddenly aroused at the time [of the killing] by some immediate and reasonable provocation." *Id.* "The term includes an emotional state of mind

8

characterized by anger, rage, hatred, furious resentment or terror." *Id.* "Additionally, words alone and disagreements among people are not enough to invoke the passion required for this defense. Mere words, no matter how provocative, are insufficient to reduce an intentional and unjustifiable homicide from murder to manslaughter." *Abeyta v. State*, 137 So. 3d 305, 311 (¶10) (Miss. 2014) (quotation marks omitted).

¶18.    In this case, the jury heard eyewitness testimony and watched video footage of the events leading up to Sims's death. Baker began acting aggressively toward Sims at the cash register as Sims attempted to buy cigarettes and leave the Jr. Food Mart. While still inside the store, Baker kept his right hand concealed in his pocket as he shouted and gestured at Sims. At one point, Baker walked away and appeared ready to leave the Jr. Food Mart. However, without any apparent provocation by Sims, Baker turned around and resumed yelling at Sims. Baker then stayed inside the store, waited for Sims to leave, and followed closely behind Sims as he left the store. According to Sibley, Baker repeatedly told Sims, "I'm on your back now. What you going to do?" Outside the store, Baker could have gotten into Polk's car and left. Instead, he stood near the front passenger side of Williams's car and continued to argue with Sims. Immediately after Williams's car lurched toward the curb, Baker fired into the car.

¶19.    On appeal, Baker claims that he shot Sims in the heat of passion after Williams's car hit Polk. However, the jury heard conflicting testimony as to whether Williams's car actually contacted Polk or anyone else. "When evidence or testimony conflicts, the jury is the sole

9

judge of witness credibility and the weight and worth of their testimony." *Bernard v. State*, 288 So. 3d 301, 306 (¶19) (Miss. 2019). Moreover, even if the car did make contact with Polk, she did not suffer any injuries, and Baker responded by shooting Sims, who was a mere passenger in the car and not the car's driver. The jury could have found that an unintentional bump of a bystander, which resulted in no injuries, was not a sufficient provocation to reduce the killing from murder to manslaughter. In addition, the jury could have found that Baker did not kill Sims in the midst of a "violent and uncontrollable rage." *Jones*, 39 So. 3d at 866 (¶36) (quoting *Mullins*, 493 So. 2d at 974). *See Gamblin v. State*, 29 So. 764, 765 (Miss. 1901) (stating that when there is a conflict in the evidence, "[t]he question whether the killing was done upon preconceived malice, or upon heat of passion upon a new provocation, [is] for the solution of the jury").

¶20. In summary, there was ample, credible evidence to support the jury's finding that Baker killed Sims with deliberate design, not in a heat of passion. Viewing the evidence in the light most favorable to the verdict, the verdict is not "so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little*, 233 So. 3d at 289 (¶1). Therefore, the trial judge did not abuse his discretion by denying Baker's motion for a new trial. *Id.* at 292 (¶21).

¶21. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, LAWRENCE AND McCARTY, JJ., CONCUR. McDONALD, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**