# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-01164-COA

**JEREME LAMOND JONES A/K/A JEREME JONES**      **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**      **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/22/2023 |
| TRIAL JUDGE: | HON. CHRISTOPHER LOUIS SCHMIDT |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: ZAKIA BUTLER CHAMBERLAIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: KATY TAYLOR SARVER |
| DISTRICT ATTORNEY: | WILLIAM CROSBY PARKER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/11/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., McDONALD AND McCARTY, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1. Jereme Jones was convicted of first-degree murder following a jury trial in the Harrison County Circuit Court and sentenced to life imprisonment. Jones now appeals, arguing that the jury's verdict was against the overwhelming weight of the evidence.

¶2. Finding no merit to Jones's claim, we affirm his conviction of first-degree murder and his sentence.

### FACTS

¶3. Shortly after midnight on September 18, 2021, Tamara Willis and Randy Johnson

were seated in the lounge area of the Golden Nugget Casino in Biloxi, Mississippi. Willis testified that she noticed a man, later identified as Jones, staring at her and Johnson. Willis asked Jones, "What's wrong, bud?" According to Willis, Jones responded, "[Y]ou good, I'm just worried about this [guy] you with watching every man that walk by like they got on a pair of heels." Willis stated that she and Johnson "laughed it off." Jones then asked Johnson if he wanted to go outside and talk, and Johnson obliged. Jones and Johnson calmly walked through the casino toward the parking garage, with Willis following them.

¶4. Willis testified that neither Jones nor Johnson expressed any hostility as they walked through the casino toward the parking garage. However, as soon as Johnson and Jones exited through the casino door and stepped into the parking garage, Johnson hit Jones in the head. Willis explained that because she was still standing inside the casino doors, she did not witness any further altercation between Johnson and Jones.

¶5. Willis testified that Johnson eventually ran back inside the casino. As he ran past Willis, Johnson told her that Jones had a gun. Willis testified that Johnson was visibly afraid as he ran from Jones. Jones ran into the casino after Johnson, and Willis testified that she ran the opposite way. Willis heard gunshots, and then she saw Jones walk out of the casino. After Jones left the casino, Willis began to search for Johnson. She learned from law enforcement that Johnson had been shot and killed.

¶6. The State played surveillance footage from the casino that showed the entire altercation. The video shows Jones, Johnson, and Willis calmly walking toward the exit of the casino and the parking garage. Jones held the door open for Johnson and Willis to exit.

2

As Johnson exited through the door, he began punching Jones. Jones punched Johnson back, and a fight ensued. During the scuffle, Jones's gun fell out of his holster. Upon seeing the gun, Johnson turned and ran back inside the casino. Jones then picked up his gun and chased after Johnson. The footage shows Jones chasing Johnson across the casino floor. Near the slot machines, Johnson fell down, got back up, and fell down again. Jones closed in on Johnson, and when Johnson fell the second time, Jones stood over him and fired ten shots. Johnson lifted his arms up, and Jones stomped on Johnson's face. Jones then walked away and exited the casino.

¶7. Law enforcement eventually apprehended Jones and arrested him in connection with Johnson's murder. Investigator James Gladden of the Biloxi Police Department testified that he interviewed Jones about the events leading up to the shooting. The State played the audio of Jones's interview to the jury and also provided the jury with a transcript of the interview.

¶8. During the interview, Jones told Investigator Gladden that as he was walking through the casino, he noticed two people—Willis and Johnson—staring at him. He approached Willis and Johnson and asked, "Do you know me?" Jones stated that Willis and Johnson started laughing, so Jones thought, "[T]hey think I'm a joke." Jones explained that he "[did not] want to cause a scene" in the casino, so he asked Willis and Johnson to go outside to talk further about why they were staring at him. Jones stated that as they exited the casino, Johnson "start[ed] swinging at me," so Jones defended himself by punching Johnson. In the scuffle, Jones's gun fell out of the holster on his waist. Jones told Investigator Gladden that after his gun fell, he "[saw] red," so he picked up his gun. Jones admitted to chasing Johnson

through the casino. When Johnson fell down near the slot machines, Jones stood over him and shot him ten times, unloading his entire clip. Jones then left the casino.

¶9. When Investigator Gladden asked Jones why he shot Johnson, Jones answered, "[T]o defend myself." Jones admitted that "it shouldn't have even gotten to that point but it was just like after . . . he hit me, . . . I saw red[.]" Jones told Investigator Gladden, "I wish [it] wouldn't [have] happened how it happened[,] but I know how I am, I know how I defend myself, I know that's why I carry a gun. . . . [T]hat's just that, it is what it is." Jones admitted that at no point during the altercation did he see Johnson with a gun.

¶10. Jones was eventually charged with first-degree murder for Johnson's death. After a trial, the jury returned a verdict finding Jones guilty of first-degree murder. The trial court sentenced Jones to life imprisonment in the custody of the Mississippi Department of Corrections. After the denial of his post-trial motions, this appeal followed.

## DISCUSSION

¶11. On appeal, Jones argues that the jury's verdict finding him guilty of first-degree murder was against the overwhelming weight of the evidence. In reviewing a challenge to the weight of the evidence, this Court "view[s] the evidence in the light most favorable to the verdict and disturb[s] the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017).

¶12. Jones was indicted for the first-degree murder of Johnson; therefore, the State bore the burden of proving beyond a reasonable doubt that Jones killed Johnson "without the

authority of law" and "with deliberate design to effect" Johnson's death. Miss. Code Ann. § 97-3-19(1)(a) (Rev. 2020). "'Deliberate design' is synonymous with 'malice aforethought' and connotes an intent to kill." *Holliman v. State*, 178 So. 3d 689, 698 (¶19) (Miss. 2015). The jury ultimately convicted Jones of first-degree murder.

¶13. However, Jones argues that the evidence presented at trial showed, at most, that he was culpable of manslaughter for allegedly killing Johnson in the heat of passion after Johnson suddenly started beating him. Mississippi Code Annotated section 97-3-35 (Rev. 2020) defines manslaughter as "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter." Miss. Code Ann. § 97-3-35. Heat of passion is

> a state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.

*Anderson v. State*, 361 So. 3d 609, 614 (¶14) (Miss. 2023) (emphasis omitted). Jones submits that the surveillance footage from the casino shows that the entire incident, from Johnson punching Jones to Jones shooting Johnson, lasted less than two minutes. Jones asserts that this brief time frame supports his claim that he did not have time to cool down after fighting with Johnson and that Jones "acted from a place of rage after being ambushed."

¶14. The evidence presented at trial shows that Johnson punched Jones, and the two men began to fight. During the fight, Jones's gun fell out of his holster. Upon seeing Jones's gun

5

on the ground, Johnson ran back into the casino. *After Johnson ran inside*, Jones picked up his gun and chased after Johnson. The surveillance footage shows Johnson visibly trying to flee from Jones, with Jones in fast pursuit. After Johnson fell to the ground, Jones stood over him and shot Johnson ten times, killing him. The Mississippi Supreme Court has held that "[d]eliberate design to kill a person may be formed very quickly, and perhaps only moments before the act of consummating the intent." *Holliman*, 178 So. 3d at 698 (¶19). Additionally, "malice, or deliberate design, may be inferred from the use of a deadly weapon." *Id*.

¶15. After hearing the testimony and evidence, the jury received instructions on first-degree murder, manslaughter, and self-defense. The jury ultimately rejected the theory that Jones shot Johnson in the heat of passion or in self-defense and instead concluded that Jones shot Johnson with deliberate design to effect his death. The jury's role is to "determine[] matters of weight, credibility, and conflicting evidence." *Beasley v. State*, 362 So. 3d 112, 126 (¶50) (Miss. Ct. App. 2023). On appeal, this Court will not reweigh evidence, assess the witnesses' credibility, or resolve conflicts between the evidence—"[t]hose decisions belong solely to the jury." *Little*, 233 So. 3d at 289 (¶1).

¶16. After viewing the evidence in the light most favorable to the verdict, we find that the jury's verdict finding Jones guilty of first-degree murder was not so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. We therefore affirm Jones's conviction and sentence.

¶17. **AFFIRMED.**

6

**BARNES, C.J., WILSON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND ST. PÉ, JJ., CONCUR.**