ON WRIT OF CERTIORARI

KING, Justice,
for the Court:
¶ 1. After being convicted by a Lowndes County Circuit Court jury for statutory rape and resisting' arrest and being sentenced to fifteen years for statutory rape, with ten years to serve and five years suspended, as well as six months for resisting arrest, Toney Jennings appealed his statutory-rape conviction. The Court of Appeals affirmed his conviction. We granted Jennings’s petition for certiorari to determine whether the trial court erred in admitting Jennings’s arguably involuntary statement to police into evidence.
FACTS AND PROCEDURAL HISTORY[1]
¶ 2. On June 9, 2010, J.S.,[2] then thirteen years old, called law-enforcement authorities, alleging that she had been raped by her neighbor, Toney Jennings, who was sixteen years old at the time. Lowndes County Sherriffs Deputy Mark McGarity responded to the call. Deputy McGarity spoke with J.S., then waited for backup before questioning Jennings. While waiting for backup, he observed Jennings exit his grandmother’s home. Deputy McGarity told Jennings that he needed to speak with him, and Jennings attempted to run away, shoving Deputy McGarity incidental to his attempt to run. Shortly thereafter, Jennings stopped running, and Deputy McGarity placed him under arrest for assaulting a police officer.
¶ 3. At the police station, Detective Eli Perrigin and Lieutenant Tony Perkins interrogated Jennings. They made an audio recording of the interrogation. The first thirty-eight seconds of the audio recording consisted of Detective Perrigin gathering biographical information from Jennings and documenting that biographical information on the Miranda,[3] warnings and waiver form. When Detective Perri-gin asked Jennings what grade he was in, Jennings responded “Ninth going to Tenth.”[4] On “Education Level” on the Miranda form, Detective Perrigin then wrote “10th,” a troubling mistake given that “Education Level” is commonly understood as the highest education level completed, and Jennings had not yet begun the tenth grade. At thirty-nine seconds, Detective Perrigin asked Jennings, ‘You don’t have an attorney right now I would think, right?” Jennings did not respond with a “yes” or a “no,” but rather made an unresponsive statement to the effect that this was the second time “this” had happened. Detective Perrigin wrote “No” as to whether Jennings had an attorney on the Miranda form, despite Jennings never having answered the question as to whether he had an attorney. At forty-five seconds, Detective Perrigin stated that, before he asked Jennings any questions, Jennings had to understand his rights. At forty-eight seconds, Detective Perrigin began reading the Miranda form, *189 nearly verbatim, although he skipped a few words. He offered no explanation of any of the Miranda warnings, nor did he ask Jennings if he understood each individual right, or even the rights as a whole. He finished reading the Miranda warnings, then stated “this” was a waiver of rights, and proceeded to read the Waiver of Rights form nearly verbatim, with no explanation of the waiver.[5] At 1:41, after spending less than a minute going over Jennings’s rights and waiver thereof, Detective Perrigin finished reading the forms and asked “You understand all that, don’t you?” Jennings responded by asking “Um, the part about an attorney. What’s attorney?”[6] In the approximately fifty-three seconds Detective Perrigin spent rotely reading the Miranda warnings and waiver of rights form, he used the word “attorney” seven times. At 1:49, Detective Perrigin summarily answered, “It’s a lawyer.” Then, without further response from Jennings, at 1:53, Detective Perrigin stated “Sign that for me right there,” and Jennings complied. Jennings never stated that he understood any of the forms or rights. Detective Perrigin seems to have decided that Jennings understood because, after he asked him if he understood and Jennings responded by asking what an attorney was, Jennings asked no further questions. But Jennings never affirmed or stated or responded that he understood anything that had been so speedily and summarily read to him.
¶ 4. During the interrogation, Detective Perrigin and Lieutenant Perkins indicated that they could not help Jennings avoid a high bond unless he “told the truth;” they indicated several times that telling “the truth” would be better for Jennings; and they indicated that Jennings would feel better if he told “the truth.” The entire time, they told him what they believed the truth was, informing him as to what “truth” they wanted to hear. Further, when Detective Perrigin read Jennings the statements that he had written for Jennings, Jennings attempted to correct him at several points, and Detective Perrigin dismissed most of Jennings’s corrections and objections to the written statements. Additionally, at about forty-eight minutes into the audio recording of Jennings’s statement, he may have stated “I’m done” twice.[7] At about 50:30, Jennings asked “Do you gotta keep on talking to me?” The interrogation lasted seventy minutes and resulted in three written statements.[8]
*190 ¶ 5. Jennings was charged with statutory rape and assaulting a police officer. At trial, Jennings moved to suppress the audio recording of his interrogation and the resulting written statements.[9] The jury was excused, and the court heard testimony from Detective Perrigin and Lieutenant Perkins. The court also listened to a portion of the audio recording of the interrogation, apparently listening only to the first few minutes of it. The trial court summarily overruled the motion to suppress, without making any findings, merely stating “Court’s going to overrule the motion to suppress.” The jury ultimately convicted Jennings of statutory rape and of resisting arrest (a lesser-included offense of assaulting a police officer). Jennings appealed his conviction, and the Court of Appeals affirmed. Jennings then filed a petition for certiorari with this Court, raising several issues, which we granted. We may limit the issues we address upon a grant of certiorari. Jones v. State, 95 So.3d 641, 645 (Miss. 2012); M.R.A.P. 17(h). Thus, we choose to address only the issue of whether the trial court erred by failing to grant Jennings’s motion to suppress his statement to police.
ANALYSIS
¶ 6. The Fifth Amendment to the United States Constitution provides that, in a criminal case, no person shall be compelled to be a witness against himself. U.S. Const, amend. V.[10] In Miranda, the United States Supreme Court created procedural safeguards to protect the Fifth Amendment right to silence. Colorado v. Spring, 479 U.S. 564, 572, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987) (citing Miranda, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694).
¶ 7. “[A] suspect may waive his Fifth Amendment privilege, provided the waiver is made voluntarily, knowingly and intelligently.” Spring, 479 U.S. at 573, 107 S.Ct. 851 (internal quotations omitted). “The inquiry whether a waiver is coerced has two distinct dimensions.” Id. at 573, 107 S.Ct. 851. First, the waiver must be voluntary, in that it must be a choice made freely and deliberately, without intimidation, coercion, or deception. Id. Second, the waiver must be knowing and intelligent, thus “made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.” Id. (quoting Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)). Courts must examine the totality of the circumstances to determine whether a waiver of rights was voluntary, knowing, and intelligent. Spring, 479 U.S. at 573, 107 S.Ct. 851; Williams v. State, 115 So.3d 774, 778 (Miss.2013).
¶ 8. “A criminal defendant who challenges the voluntariness of [his] waiver [of rights] has a due process right to a reliable judicial review of whether the confession was, in fact, voluntarily given.” *191 Pitchford v. State, 45 So.3d 216, 242 (Miss. 2010) (emphasis added); see also Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). The prosecution then bears the burden of proving beyond a reasonable doubt that a statement was given after a valid waiver, and was thus voluntary, knowing, and intelligent. Jordan v. State, 995 So.2d 94, 106 (Miss.2008). “When an accused makes an in-custody inculpatory statement without the advice or presence of counsel, even though warnings and advice regarding his privilege against self-incrimination have been fully and fairly given, the State shoulders a heavy burden to show a knowing and intelligent waiver.” Williams, 115 So.3d at 778 (quoting Neal v. State, 451 So.2d 743, 753 (Miss.1984)).
¶ 9. The totality-of-the-circumstances approach mandates inquiry into all the circumstances surrounding the interrogation, including those surrounding the interrogation of a juvenile. Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979); McGowan v. State, 706 So.2d 231, 235 (Miss.1997). Evaluating the circumstances surrounding the interrogation “includes [an] evaluation of the juvenile’s age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.” Fare, 442 U.S. at 725, 99 S.Ct. 2560; McGowan, 706 So.2d at 235. Furthermore, “when faced with an accused of limited intelligence, the trial court must inquire into the mental capacity of the accused to determine whether the accused even had the mental capacity to understand and waive his Miranda warnings.” McGowan, 706 So.2d at 236 (emphasis added).
¶ 10. The determination of whether a confession was voluntary is highly factual, and a trial court’s decision that a confession is admissible should be overruled on appeal only if the trial court committed manifest error, the decision was contrary to the overwhelming weight of the evidence, or the court applied the incorrect legal standard. Williams, 115 So.3d at 778; McCarty v. State, 554 So.2d 909, 912 (Miss.1989). However, when the trial court fails to make specific findings of fact regarding voluntariness, “this Court’s scope of review is considerably broader.” McCarty, 554 So.2d at 912.
¶ 11. The State failed to prove beyond a reasonable doubt that Jennings’s waiver and statement were voluntary, given the many problematic issues with each. First, the waiver of Miranda rights in this case is highly suspect because:
1) the accused was a functionally illiterate juvenile in Special Education;
2) the rights were read in an extremely quick and summary manner, taking approximately fifty-three seconds;
3) the rights were not explained, but rather, Detective Perrigin gave only a rote recitation of the rights and waiver;
4) Detective Perrigin failed to ask whether Jennings understood each individual right, and indeed failed to ask whether he understood all the Miranda rights as a whole. Detective Perrigin did not ask Jennings if he “understood” anything until after he had read him all of his rights and the waiver of rights;
5) Jennings never stated that he understood his rights or the waiver thereof;
6) Jennings asked what an attorney was, clearly indicating that he had not understood a basic and essential ingredient of the rights and waiver, and Detective Perrigin summarily and inadequately answered his question;
*192 7) Detective Perrigin exaggerated Jennings’s education level on the form, despite Jennings’s repeated statements that he was “going into tenth grade.”
¶ 12. The trial court summarily overruled Jennings’s motion to suppress, without making any findings that the waiver was voluntary, knowing, and intelligent, and it certainly made no indication that it evaluated the juvenile’s age, experience, education, background, and intelligence, and whether he had the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights. Nor did it evaluate his mental capacity. Because the trial court is the ultimate fact-finder on issues of the voluntariness of a confession, and because the trial court made no findings of fact after a fairly short mid-trial suppression hearing, the record is undeveloped in this case. Further, because of the lack of findings and summary nature of the trial court’s ruling, this Court cannot determine whether the trial court employed the correct legal standard in overruling the motion to suppress. Indeed, we recognize that, although defense counsel raised issues about reading,[11] mental abilities, and improper interrogation techniques, the portions of the confession relevant to those issues do not appear to have been played during the suppression hearing. Rather, the State selectively played only the portion of the recording related to the Miranda waiver. Even standing alone, though, this small portion of the audio recording is highly problematic.
¶ 13. Additionally, the bulk of the confession was not examined for voluntariness at the suppression hearing, as it does not appear that the trial court heard it until it was introduced into evidence in front of the jury, despite the defendant raising these issues during cross-examination. This oversight, combined with the arguably overreaching interrogation techniques and Jennings’s possible invocations of the right to silence, fill us with a sense of disquiet. See Agee v. State, 185 So.2d 671, 674 (Miss.1966) (telling the defendant that “it would be lighter on him if he’d tell the truth” rendered a confession inadmissible because it offered the accused “some hope of reward” or “hope of leniency”); Carley v. State, 739 So.2d 1046, 1053 (Miss.Ct. App.1999) (mental weakness coupled with overreaching interrogation tactics “may become the basis for the exclusion of a confession”). It is also of concern that when Jennings corrected Detective Perri-gin in regard to the written statements, Detective Perrigin by and large brushed off Jennings’s concerns,[12] and told him to sign the written statements without making most of the corrections. Again, however, the state of the record is undeveloped and unclear on these issues, and findings of fact absent, rendering it imprudent for this Court to make a factual judgment that the waiver or statements were involuntary.
¶ 14. The State clearly failed to prove beyond a reasonable doubt that Jennings’s waiver and statement were voluntary, *193 knowing, and intelligent, given the many problems surrounding the waiver and the dearth of evidence supporting its volun-tariness. As an appellate court without the benefit of viewing witnesses and determining credibility, without the benefit of any findings of fact or a well-developed record, and without the benefit of knowing what, if any, legal standard the trial court employed, we feel the best and most prudent solution in this case is to reverse and remand this case for a new trial and a new and reliable suppression hearing in which a specific determination regarding volun-tariness may be made, and a record adequately developed. In this suppression hearing, the trial court should make findings on the admissibility of the statement based on the totality of the circumstances, specifically evaluating Jennings’s mental capacity, age, experience, education, background, and intelligence, and whether he had the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.
¶ 15. Thus, we reverse the judgment of the Court of Appeals, as well as the judgment of the Lowndes County Circuit Court and remand this case to the trial court for proceedings consistent with this opinion.
¶ 16. REVERSED AND REMANDED.
DICKINSON, P.J., KITCHENS AND CHANDLER, JJ„ CONCUR. RANDOLPH, P.J., AND LAMAR, J., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. WALLER, C.J., PIERCE AND COLEMAN, JJ„ CONCUR IN PART AND IN RESULT WITHOUT SEPARATE WRITTEN OPINION.

. The Facts and Procedural History recited will be limited to those facts germane to the sole issue we will address, namely the issue of the voluntariness of Jennings’s waiver of rights and confession.

. Initials of the victim are used to protect her identity.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. This response is understandable given that the interrogation occurred on June 9, 2010, most likely during the summer holidays.

. Detective Perrigin badly mispronounced the word "coercion” (as "co-assertion”), to the point it is virtually unrecognizable. This Court was able to determine that he meant "coercion," as the form from which he read is in the record. His mispronunciation occurred while asking Jennings to affirm that he was not under coercion for purposes of the waiver of rights, and he did not correct his mispronunciation. Later in the interview, Jennings stated several times that he could not read and was in special education, thus he would not have been able to read the form to understand to what Detective Perrigin was referring when he used the nonexistent word "co-assertion.”

. Both trial and appellate counsel argue that Jennings’s question asking what an attorney is was a request for an attorney. We need not address this argument, as it is without merit. Clearly in this circumstance, asking what an attorney is evinces a lack of understanding of his rights, but was in no way a request for an attorney. However, counsel also argued that the Miranda waiver was involuntary, and not knowing and intelligent, due to Jennings’s age, education level, and mental abilities, thus these issues were properly presented to the trial court.

. At some points in the audio recording, it is difficult to understand exactly what was said. The record does not contain a transcript of the audio recording.

. During the statement, Jennings stated, and the police officers seem to concede, that he had never been arrested or had an encounter with the legal system before.

. Defense counsel stated that he did not file a written motion to suppress because he believed his client would testify and it would come in "on the back side” anyway. This reasoning is perplexing. First, if a statement was found to be involuntary, it would not come in "on the back side” to impeach the defendant. Second, even if it was found to be voluntary and could be used to impeach Jennings, if it was found to be in violation of the technicalities of Miranda, it could not be used in the State's case-in-chief as evidence of the crime. See Powell v. State, 483 So.2d 363, 368-69 (Miss.1986). Thus, failing to file a written motion to suppress merely based upon a belief that a defendant would be testifying makes little sense.

. The Mississippi Constitution similarly provides that, in a criminal prosecution, no person shall be compelled to give evidence against himself. Miss. Const, art. 3, § 26 (1890).

. It concerns us that Detective Perrigin testified in the suppression hearing that "we did talk about reading, you know, and he was okay with reading” when the audio recording makes clear that when Detective Perrigin and Jennings talked about reading, Jennings consistently stated that he could not read. However, that portion of the audio recording does not appear to have been played during the suppression hearing.

. For example, Detective Perrigin read the following line to Jennings from his third written confession: "She told me to stop when it started hurting her but I didn't.” Jennings immediately corrected him "I did” and a discussion ensued in which he explained that he did stop. Detective Perrigin did not change the line in the written confession, and nonetheless had Jennings sign that confession, knowing Jennings was functionally illiterate.