# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-00529-COA

**DERRION ELOBY A/K/A DERRION XAVIER ELOBY**                    APPELLANT

v.

**STATE OF MISSISSIPPI**                    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 04/24/2024 |
| TRIAL JUDGE: | HON. MARGARET CAREY-McCRAY |
| COURT FROM WHICH APPEALED: | SUNFLOWER COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | GRAHAM PATRICK CARNER |
| | SPENCER CASH |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | WILLIE DEWAYNE RICHARDSON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/10/2026 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**LASSITTER ST. PÉ, J., FOR THE COURT:**

¶1.    Derrion Eloby was convicted of capital murder and armed robbery in the Sunflower County Circuit Court.  For his capital murder conviction, the trial court sentenced Eloby to life imprisonment in the custody of the Mississippi Department of Corrections (MDOC) with the possibility of parole.  For his armed robbery conviction, the trial court sentenced Eloby to a ten-year suspended sentence, with five years of post-release supervision. The trial court ordered Eloby's sentence for armed robbery to run consecutively to his sentence for capital murder. Eloby now appeals his convictions and sentences.

¶2.    On appeal, Eloby raises the following issues: (1) the trial court erred in admitting his

statements to law enforcement; (2) the State failed to prove all elements of capital murder as charged in the indictment; (3) the State's loss of evidence violated his due process rights; (4) his right to a speedy trial was violated; (5) the trial court erred in admitting a gun into evidence; (6) the trial court erred in allowing evidence of a co-defendant's prior bad acts; and (7) cumulative error requires reversal.

¶3.     After our review, we find no error. We therefore affirm Eloby's convictions and sentences.

## FACTS

¶4.     On August 10, 2012, Merio Harris and his roommate Nathan Williams were robbed in their home in Drew. During the course of the robbery, Williams was shot and killed.

¶5.     Harris testified that on the evening of the shooting, he and Williams were selling marijuana from their house, after which they retired to their individual bedrooms, and Harris began counting his money. At approximately 10:30 or 11:00 p.m., two men wearing ski masks and carrying firearms entered Harris's bedroom. Harris testified that he did not know the men and could not see their faces because they wore masks. One man pointed a gun at Harris and told him to "give it up and lay down," referring to the money Harris was counting. Harris complied. Several minutes later, Harris heard a gunshot in another part of the house. He got up, walked to the hallway, and discovered Williams lying on the floor. Harris called 911 and then drove Williams to the hospital. Williams eventually died from his injuries.

¶6.     Chief Deputy Marvin Flowers of the Sunflower County Sheriff's Department

investigated the robbery and murder. During his investigation, Chief Deputy Flowers spoke with Harris, as well as Brian Hannon, Sophia Sharkey, and Cartisha Banks. Banks testified that on the night of the incident, she, Sharkey, and Hannon rode in Sharkey's truck to Harris and Williams's house to purchase marijuana. They pulled up to the house, and Hannon exited the vehicle. Banks testified that as Hannon approached the door to the house, three men "with masks and guns" came out the door and went to the back of the house. Hannon then entered the house, and Sharkey pulled her truck out of the driveway to follow the three men with guns. Sharkey and Banks proceeded to follow the men, and they observed the men get into a dark-colored truck. Sharkey, Banks, and Hannon then followed behind Harris as he drove Williams to the hospital. While driving to the hospital, Sharkey announced that she had spotted the masked men's vehicle. Sharkey called the police and provided the tag number of the vehicle.

¶7.     Harris testified that a day after the shooting, he found a shell casing in his bedroom. Harris alerted the sheriff's department, and Harris testified that someone from the sheriff's department came to his house and collected the shell casing. At trial, Chief Deputy Flowers denied that a shell casing was recovered from Harris's home.

¶8.     The case eventually went cold until 2013, when Investigator Bill Staten from the Leflore County Sheriff's Department contacted Chief Deputy Flowers and informed him that he had detained someone with information related to the case. Chief Deputy Flowers went to the Leflore County Sheriff's Department and spoke with Davontay Brown (Davontay).

3

After speaking with Davontay, Chief Deputy Flowers searched Davontay's cell phone and Facebook page. Based on information he gleaned from these searches, Chief Deputy Flowers obtained a warrant for Eloby, Jabrandon Green, Edwin Brown (Brown), and Carlos Jones.

¶9. In 2015, a Sunflower County grand jury indicted Eloby, Green, Brown, and Jones for one count of capital murder with the underlying crime of armed robbery and a standalone count of armed robbery. In 2021, the original indictment was nolle prossed due to a defect, and a second Sunflower County grand jury indicted each co-defendant for one count of capital murder with the underlying crime of burglary and one count of armed robbery. Each charge included an added firearm enhancement.

¶10. Before trial, Green—after agreeing to a plea deal with the State and agreeing to testify against Eloby, Brown, and Jones—successfully moved to sever his trial from his co-defendants.

¶11. Eloby, Brown, and Jones (collectively, the Defendants) were jointly tried on January 30, 2024, through February 2, 2024. At trial, the jury heard testimony from Harris, Banks, Chief Deputy Flowers, and Green, as well as Dr. Mark LeVaughn, a forensic pathologist at the Mississippi State Medical Examiner's Office; Officer Kevin Nelson of the City of Horn Lake Police Department; Investigator Darrell Saxton of the Sunflower County Sheriff's Department; Mark Boackle of the Mississippi Forensics Laboratory, an expert in the field of firearms and toolmarks; and Audra Brown, Brown's wife.

¶12. After Chief Deputy Flowers testified, the defendants moved for a mistrial. Counsel

4

for the Defendants claimed that Chief Deputy Flowers indicated through his testimony[1] that evidence was intentionally destroyed and that some of the State's evidence was not disclosed to the Defendants. The Defendants also asserted that these evidentiary issues were relevant to their motion to dismiss based on a speedy trial violation, and they renewed their speedy trial motion. After hearing arguments from counsel, the trial court denied the motions for a mistrial or dismissal, and the trial continued.

¶13.    Green testified that on the night of the shooting, he and the Defendants drove to Harris and Williams's residence with the intention of robbing the house for drugs. According to Green, Brown drove the men in his silver Pontiac car. The men drove past the house to make sure the coast was clear, and then Brown parked his car on a gravel road, out of sight. Green, Eloby, and Jones then exited the vehicle carrying guns and ski masks. Green testified that Jones entered the house through a window and then opened the door to allow Green and Eloby inside. Green claimed that during the robbery, Eloby ordered Williams to lie down, and when Williams refused, Eloby shot him.

¶14.    Dr. LeVaughn testified that Williams was shot in the left shoulder and died as a result of internal bleeding. Dr. LeVaughn opined that Williams's manner of death was homicide. During Williams's autopsy, a bullet was recovered from his body, and the sheriff's department sent the bullet to the Mississippi Forensics Laboratory.

---

[1] We will further discuss Chief Deputy Flowers's testimony and Eloby's claim regarding the State's evidence in our analysis below.

¶15. Officer Nelson testified that at approximately 7:30 p.m. on August 11, 2012, the evening after the shooting, he was sitting in a patrol car at an intersection in Horn Lake, Mississippi. Officer Nelson observed that the driver of a passing vehicle was not wearing a seatbelt and that the two people inside the vehicle "appeared noticeably nervous." Officer Nelson proceeded to conduct a traffic stop of the vehicle. Officer Nelson testified that Davontay Reedus and Eloby were the occupants of the vehicle. During a search, officers found 1.6 grams of marijuana separately packaged on Eloby's person, and $190 in cash in $5 denominations. A K-9 search revealed a Taurus 9mm handgun underneath the front passenger seat where Eloby was sitting, and Eloby was charged with possession of a handgun by a minor.

¶16. In April 2021, Chief Deputy Flowers learned that the Horn Lake Police Department had taken possession of Eloby's gun during the traffic stop in 2012. Investigator Darrell Saxton testified that upon orders from Chief Deputy Flowers, he had retrieved the gun and logged it into evidence at the Sunflower County Sheriff's Department. Investigator Saxton then took the gun to the Mississippi Forensics Laboratory and advised the laboratory staff that they needed to compare the gun to the bullet recovered from Williams's body. According to Investigator Saxton, laboratory staff informed him that they had returned the bullet to Chief Deputy Flowers. Investigator Saxton eventually located the bullet in the evidence room at the sheriff's department, and he returned the bullet to the Mississippi Forensics Laboratory for testing.

6

¶17.    Mark Boackle testified as an expert in the field of firearms and tool marks. Boackle testified that he analyzed Eloby's Taurus 9mm gun and the bullet recovered from Williams's body. Boackle opined that the bullet "bears class characteristics consistent with 9mm." However, in comparing the bullet to the gun, Boackle determined that while the bullet had similar class characteristics with those produced by Eloby's gun, it "could not be positively included or excluded as having been fired in [Eloby's] gun . . . to the exclusion of all other firearms bearing the same class characteristics." Boackle testified that this was due to the mutilation and "insufficient reproduction" of the bullet recovered from Williams's body. Boackle explained that the bullet's outer covering had "ripped away from the core" of the bullet, and this mutilation made it hard to further classify or identify whether the bullet was fired from Eloby's gun. Boackle testified that a bullet jacket can sometimes separate from the core of the bullet when the gun is fired or when the bullet hits something hard, like "bone, glass, [or] metal."

¶18.    After the State rested its case-in-chief, the Defendants moved for directed verdicts, arguing that the State had not met its burden of establishing a prima facie case of capital murder and armed robbery against the Defendants. The trial court denied the motion.

¶19.    Finally, Brown's wife, Audra, testified as Brown's alibi witness. Audra testified that on the evening of the shooting, Brown was at home babysitting their infant grandchild while Audra was at work. Two photographs taken by Audra and posted on Facebook were admitted as exhibits. Each photo showed Brown and had a date printed on the center of the

7

photo—one from August 10, 2012, and the other from August 11, 2012. Audra testified that the dates contained in the captions were autogenerated. During closing arguments, the State disputed Audra's claim that the dates in Facebook captions were autogenerated, and the State encouraged the jury to use common sense as to whether Audra herself placed the date on the caption. Audra also testified that neither she nor Brown had ever owned a silver Pontiac car.

¶20.   The jury ultimately returned verdicts finding the Defendants guilty of capital murder, with the underlying charge of burglary, and armed robbery. For his capital murder conviction, the trial court sentenced Eloby to life imprisonment in the custody of the MDOC with the possibility of parole. For his armed robbery conviction, the trial court sentenced Eloby to a ten-year suspended sentence and five years of post-release supervision, set to run consecutively to his sentence for capital murder.

¶21.   Eloby filed a motion for a judgment notwithstanding the verdict or a new trial, which the trial court denied. This appeal followed.

## ANALYSIS

### I.   Admission of Eloby's Statements

¶22.   Eloby argues that the trial court erred by allowing his statement to Flowers to be admitted into evidence despite testimony that Flowers promised Eloby immunity from prosecution in exchange for the statement. Eloby further argues that the alleged promise of immunity rendered his statement involuntary. He urges this Court to reverse because the trial court did not make specific findings of fact regarding Flowers's alleged promise of

8

immunity.

¶23. We review the admission of evidence, including confessions, for an abuse of discretion. *Taylor v. State*, 330 So. 3d 758, 761-62 (¶7) (Miss. 2021). We will reverse the trial court's denial of a motion to suppress only if the court's decision was "manifestly in error or contrary to the overwhelming weight of the evidence." *Lott v. State*, 380 So. 3d 929, 931 (¶12) (Miss. 2024). In determining whether a confession was voluntary, we consider the totality of the circumstances. *Greenlee v. State*, 725 So. 2d 816, 826 (¶26) (Miss. 1998).

¶24. "The prosecution has the burden of proving beyond a reasonable doubt that the confession was voluntary." *Id.* The State can satisfy that burden "by testimony of an officer, or other persons having knowledge of the facts, that the confession was voluntarily made without threats, coercion, or offer of reward." *Id.* When "the State has laid the proper predicate, the onus is then on the defendant to provide other evidence or testimony on the voluntariness issue to rebut the state's assertion." *Id.* (quotation marks omitted).

¶25. "Once a determination of voluntariness is made by the trial court, the defendant bears a heavy burden in attempting to reverse the trial court's finding that the confession is admissible." *Keller v. State*, 138 So. 3d 817, 850 (¶72) (Miss. 2014).

¶26. At the suppression hearing, Chief Deputy Flowers testified that he first tried to interview Eloby on July 8, but Eloby refused to talk. On July 10, Eloby's mother, Tasha, and his aunt came to the sheriff's department and were able to speak with Eloby privately.

9

Afterward, Chief Deputy Flowers brought a *Miranda*[2] waiver form, which Eloby signed. Chief Deputy Flowers testified at the hearing that he told Eloby it was time to "grow up" and "be a man." Chief Deputy Flowers testified that he called Eloby's mother and aunt back into the room after Eloby signed the waiver, and then Eloby gave a confession. Eloby wrote a statement as well, but the written statement was less detailed than his oral one. Chief Deputy Flowers denied offering Eloby any immunity or leniency in exchange for his statement.

¶27.    Chief Deputy Flowers said at the hearing that it was standard procedure to record all interviews, but he admitted that the recording had been lost since it was taken.

¶28.    Tasha testified that she was able to meet with Eloby at the sheriff's department. She said she had not been aware of the charges when she first spoke with him. Tasha testified that Eloby looked scared. Tasha said that Chief Deputy Flowers told her that Eloby would have "immunity" if he would give a statement because law enforcement really "wanted" Green. Tasha testified that she asked Chief Deputy Flowers what immunity meant, and he told her that it would help Eloby avoid "heavy charges." She testified that this interaction was "stressful" and "fast."

¶29.    When she and her sister spoke privately with Eloby, she encouraged him to tell Chief Deputy Flowers the truth. They left the room while Eloby was informed of his *Miranda* rights and signed the waiver. Chief Deputy Flowers let them back in during Eloby's statement.

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶30.   Following Tasha's testimony, the State called Deputy Brian Reed, who testified that he had no memory of Chief Deputy Flowers offering Eloby immunity. Deputy Reed witnessed Eloby signing the *Miranda* waiver but admitted he had not been privy to any conversation preceding the waiver. He did not hear the confession.

¶31.   The trial court entered an order denying Eloby's motion. In the order, the court recounted Chief Deputy Flowers's, Tasha's, and Reed's testimony and acknowledged that the audio or video recording of Eloby's statement was unavailable. Ultimately, the trial court determined that "under the totality of the circumstances," Eloby's statement "was knowingly and voluntarily given."

¶32.   We find no abuse of discretion in the trial court's ruling. Eloby argues that the trial court's order without detailed findings requires reversal, but detailed findings are not required, particularly where it is clear that the trial court considered the evidence before it and reached a conclusion supported by that evidence. Eloby relies on the Supreme Court's rulings in *McCarty v. State*, 554 So. 2d 909 (Miss. 1989), and *Jennings v. State*, 127 So. 3d 185 (Miss. 2013), to support his argument that the trial court's findings here were not detailed enough, but these cases are easily distinguished.

¶33.   In *McCarty*, the defendant argued that he was never advised of his *Miranda* rights and made no statement to law enforcement and sought to suppress any testimony to the contrary. *McCarty*, 554 So. 2d at 911. The trial court made no findings of fact and instead, after listening to the evidence, stated that McCarty's motion to suppress "should be and is hereby

11

overruled." *Id.* at 912. In *Jennings*, the defendant moved mid-trial to suppress a recording of his statements to law enforcement, and the court heard testimony from two officers and listened to part of the recorded statement. *Jennings*, 127 So. 3d at 190 (¶5). The court then "summarily overruled the motion to suppress, without making any findings, merely stating 'Court's going to overrule the motion to suppress.'" *Id.*

¶34.    In both cases, the trial court summarily denied the motions to suppress without making *any* findings. In the present case, the trial court's written order outlined the evidence presented at the hearing, applied the law, and concluded that Eloby's statement was "knowingly and voluntarily given." *McCarty* and *Jennings* do not require reversal.

¶35.    The trial court, not this Court, was in a better position to weigh Chief Deputy Flowers's and Tasha's credibility and competing testimony. The conclusion that Eloby's statement was "knowingly and voluntarily given" necessarily includes the trial court's finding that Chief Deputy Flowers did not promise immunity in exchange for the statement. This conclusion is supported by the evidence, and we affirm the trial court's ruling.

## II.    Sufficiency of the Evidence

¶36.    Eloby argues that the evidence was insufficient to prove capital murder as charged in the indictment because the indictment alleged that the Defendants broke into Williams's home with the intent to steal property *and* commit an assault *and/or* kill persons therein. Eloby argues that the only evidence of the Defendants' intent was evidence of their intention to steal drugs, and because the State included "assault" and "kill" with the conjunctions

12

"and" and "and/or," the State was required to prove all three. Eloby essentially argues that the State increased its burden by using all three intended crimes.

> When reviewing a challenge to the sufficiency of the evidence, the Court considers each element of the offense and reviews all of the evidence in the light most favorable to the verdict. The Court must accept as true all credible evidence consistent with guilt. The Court must give the State the benefit of all favorable inferences that may reasonably be drawn from the evidence. Moreover, matters regarding the weight and credibility given the evidence are the province of the jury. The Court may reverse only when, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty. Thus, if any rational trier of fact could have found each and every one of the elements of the crime beyond a reasonable doubt, when viewing the evidence in the light most favorable to the prosecution, the verdict must stand.

*Smith v. State*, 250 So. 3d 421, 424 (¶12) (Miss. 2018) (quoting *Cowart v. State*, 178 So. 3d 651, 666 (¶41) (Miss. 2015)).

¶37. The Defendants were charged with capital murder under Mississippi Code Annotated section 97-3-19(2)(e) (Rev. 2020), also called felony murder, which requires proof of "the killing of a human being without the authority of law . . . by any person engaged in the commission of the crime of . . . burglary . . . ." Proof of burglary requires evidence of breaking and entering with the intent to commit "some crime" inside. Miss. Code Ann. § 97-17-23(1) (Rev. 2020). The Supreme Court has held that "only the *intent* to commit some crime, be it a felony or a misdemeanor, is an element of the crime of burglary." *Quinn v. State*, 191 So. 3d 1227, 1233 (¶22) (Miss. 2016) (emphasis added).

¶38. The indictment charged the Defendants with committing capital murder by killing Williams while "engaged in the crime of Burglary of a Dwelling by . . . breaking and entering

13

the dwelling house at 66 Hunter Road, Drew, Mississippi, the property of Nathan Williams, with the intent to take[,] steal[,] and carry away personal property located therein and commit an assault and/or kill persons located therein." Eloby does not argue that the State failed to prove the breaking and entering, Williams's death, or the intent to take, steal, or carry away personal property. He challenges the inclusion of "and commit an assault and/or kill persons located therein." Eloby argues that the State increased its burden of proof by including the intent to assault and kill—he argued at oral argument that the use of "and/or"[3] is a conjunctive, not disjunctive, phrase—and that the State is bound to prove the Defendants entered the home with an intent to steal, an intent to assault, and an intent to kill.

¶39.   However, this argument does not comport with our caselaw. If burglary requires only proof of an intent to commit *some crime*, it does not follow that we must reverse a conviction predicated on burglary where there is uncontroverted proof of some intended crime (i.e., intent to steal) simply because the State included more crimes than necessary in its indictment. *Smith v. State*, 250 So. 3d 421 (Miss. 2018), is instructive.

¶40.   In *Smith*, the defendant challenged the sufficiency of the State's evidence of armed robbery but did not argue that the State failed to prove all necessary elements; instead, Smith

---

[3] Legal writing scholars have called this phrase an "unfortunate hybrid," a "drafting blemish," and "sloppy." Antonin Scalia and Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 125 (2012). Justice Scalia and Garner note that "[t]he literal sense of and/or is 'both or either,' so that 'A and/or B' means (1) 'A,' (2) 'B,' or (3) 'both A and B.'" *Id.* So Eloby is incorrect; "and/or" is both a conjunctive and disjunctive phrase. While it does not sway our decision here, we agree with these experts that the "use of the sloppy and/or" should be avoided.

claimed that the State's inclusion of the specific items taken during the robbery required the State to prove that each item was taken. *Id.* at 424-25 (¶13). The Supreme Court rejected Smith's argument, reasoning that it was well established that the armed robbery statute did not require an indictment to list the specific item that was the subject of the armed robbery, as the item taken was not a necessary element. *Id.* at (¶14). The Supreme Court held that the addition of the specific personal property in Smith's indictment "was not necessary to the indictment, [but] it also was not improper," noting that the inclusion of the specific personal property did not "implicate an additional substantive element not present in the armed robbery statute, nor [did] it change armed robbery to another potential crime." *Id.* at 427 (¶22). The Supreme Court also suggested that the State could have moved to amend the indictment to remove the specific items and that the amendment would not have been a substantive change to the indictment, as it did not change the crime charged. *See id.* at 427-29 (¶¶21, 27, 28).

¶41.    The Supreme Court concluded that the State proved every element of armed robbery and that Smith was not entitled to a judgment of acquittal "because the jury clearly found at trial that the State's proof showed that personal property was taken from [the victim's] house during the robbery," satisfying the elements of armed robbery. *Id.* at 429 (¶28).

¶42.    We acknowledge that the issue in *Smith* involved an indictment that listed specific personal items taken when it was clear that the specific items taken in an armed robbery were not necessary elements, whereas an indictment for capital murder predicated on burglary

15

must include the underlying crime in the burglary. However, the rationale still stands—the inclusion of multiple intended crimes "was not necessary to the indictment, [but] it also was not improper." *Id.* at 427 (¶22).

¶43. The State presented sufficient evidence to prove that the Defendants broke and entered Williams's home with an intent to commit a crime therein—to steal property (drugs). That satisfies the State's burden, and, like Smith, Eloby is not entitled to a judgment of acquittal "because the jury clearly found at trial that the State's proof showed" that the Defendants entered the home with an intent to steal drugs. *Id.* at 429 (¶28).

¶44. Additionally,

> [t]he State seldom has direct and positive testimony expressly showing the specific intent of an intruder at the time he unlawfully breaks into a dwelling house; however, such testimony is not essential to establish the intent to commit a crime. Some presumptions are to be indulged in against one who enters a building unbidden, at a late hour of night, else the burglar caught without boot[y] might escape the penalties of the law. Intent is an emotional operation of the mind, and it is usually shown by acts and declarations of the defendant coupled with facts and circumstances surrounding him at the time. Defendant's intention is manifested largely by the things he does.

*Cortez v. State*, 876 So. 2d 1026, 1030 (¶12) (Miss. Ct. App. 2003). The jury "is entitled to consider not only facts as testified to by witnesses, but all inferences that may be reasonably and logically deduced from the facts and evidence." *Id.* at (¶13). Here, the jury could reasonably infer that the Defendants' "unbidden" entry into Williams's house "at a late hour of the night," wearing masks and each armed with a weapon, did not evidence only an intent to rob. Because eyewitnesses testified the intruders also had firearms, the jury could infer

16

they also possessed the intent and ability to assault or kill once inside. Direct testimony from a witness of the Defendants' intent was not necessary given the totality of the circumstances of the crime.

¶45. Thus, the State presented sufficient evidence of capital murder by proving that William's death occurred during a burglary and that the Defendants broke and entered Williams's home with the intent to commit some crime therein. The fact that the State included multiple crimes for the underlying burglary did not increase its burden of proof, and Eloby is not entitled to a judgment of acquittal.

### III. Loss of Evidence

¶46. Eloby asserts that the State's destruction, loss, and mishandling of evidence violated his due process rights. Eloby claims that he was prejudiced due to the State's mishandling and improper storage of the bullet recovered during Williams's autopsy and the firearm allegedly connected to Eloby. He further argues that he was prejudiced by the loss or destruction of the missing audio files of recorded witness interviews and Chief Deputy Flowers's notes that he used to draft his final case report. Finally, Eloby asserts that the State erred by mishandling and failing to test the shell casing that Harris claimed he turned over to law enforcement, which Eloby claims had the forensic potential to link or exclude a firearm. Eloby argues that the loss of the audio files, notes, and shell casing deprived him of the ability to show the items' exculpatory value.

¶47. We recognize that "[t]he State has the duty to preserve evidence . . . which might be

expected to play a significant role in the suspect's defense." *Northup v. State*, 793 So. 2d 618, 623 (¶16) (Miss. 2001) (quotation mark omitted). To determine whether the State violated Eloby's due process rights based upon destruction or spoliation of evidence, Eloby must show the following:

> (1) the evidence in question must possess an exculpatory value that was apparent before the evidence was destroyed; (2) the evidence must be of such a nature that [Eloby] would be unable to obtain comparable evidence by other reasonably available means; and (3) the prosecution's destruction of the evidence must have been in bad faith.

*Robinson v. State*, 247 So. 3d 1212, 1234 (¶56) (Miss. 2018). Eloby must meet all three of these requirements to successfully prove that his due process rights were violated. *Childs v. State*, 133 So. 3d 348, 350 (¶10) (Miss. 2013).

¶48. Regarding Eloby's claim that the State mishandled the projectile recovered from Williams's autopsy, we find nothing in the record to support this claim. Although the testimony at trial reflects that the projectile was damaged, Boackle testified that a projectile's outer covering can sometimes separate from the core of the bullet when the gun is fired or when the projectile hits something hard, like "bone, glass, [or] metal." As for the shell casing that Harris claims law enforcement collected from his bedroom, Chief Deputy Flowers testified at trial and denied that a shell casing was recovered from Harris's home, and the Defendants were able to cross-examine Chief Deputy Flowers on that point.

¶49. Chief Deputy Flowers also testified regarding his investigation of the shooting. After Chief Deputy Flowers developed suspects, he issued arrest warrants for the Defendants.

18

Chief Deputy Flowers testified that he interviewed Eloby in July 2013, and during that time Eloby implicated Green as the person who shot Williams. Chief Deputy Flowers recorded his 2013 interview with Eloby. Eloby also provided a written statement. Chief Deputy Flowers admitted that "throughout the years, [the recorded interview] got misplaced." However, Eloby's written statement was entered into evidence at trial.

¶50. During cross-examination, counsel for the Defendants questioned Chief Deputy Flowers about his law enforcement training for conducting an investigation. Chief Deputy Flowers agreed that he was trained to keep up with everything relevant to each investigation and include the information in a report. Counsel for the Defendants asked Chief Deputy Flowers about the recordings of his interviews with various witnesses to the shooting. Chief Deputy Flowers testified that over the course of the years, the recordings had been "misplaced."

¶51. Chief Deputy Flowers also testified that as he conducted his investigation in this case, he made notes on a sticky pad and a notepad to help him prepare his offense report. He admitted that after he prepared his offense report, he did not include his handwritten notes in the case file, explaining "[t]hat was years ago." When asked by counsel for the Defendants where he put his handwritten notes, Chief Deputy Flowers answered, "I don't know where I put them . . . . Probably [threw] them away." He did not recall when he threw the notes away, explaining, "This has been over 12, 13 years." However, he testified that the offense report he prepared contained the information from his handwritten notes.

19

¶52.    Counsel for Defendants also questioned Chief Deputy Flowers about arrest warrants he issued for people other than the Defendants, namely, Tasha Green and Vanquilla Johnson. Chief Deputy Flowers stated that he did arrest Tasha Green and Vanquilla Johnson and interviewed them regarding the shooting. He recalled taking a written statement from Tasha and Vanquilla and that their statements "should" be incorporated into the case file. Upon reviewing the case file, Chief Deputy Flowers clarified that he did *not* take a written statement from Tasha and Vanquilla. When asked about his prior testimony stating that he *had* taken a written statement from Tasha and Vanquilla, Chief Deputy Flowers explained that the misstatement was due to the long amount of time that had passed since the interviews.

¶53.    After Chief Deputy Flowers's testimony, counsel for the Defendants made a tandem motion for a mistrial and a motion to dismiss on the grounds due process violations and speedy trial violations. The Defendants argued that the State's failure to turn over Chief Deputy Flowers's handwritten statements and notes from the interviews with witnesses Tasha and Vanquilla constituted a due process violation under *Brady v. Maryland*, 373 U.S. 83 (1963).[4] The Defendants also argued that the State's failure to preserve certain evidence and the destruction of evidence violated their due process rights. The Defendants asserted that they were unaware the statements and notes existed until trial. The Defendants admitted that the content of Chief Deputy Flowers's notes was unknown, but counsel for the Defendants

---

[4] Eloby does not assert a *Brady* claim on appeal.

argued that "that there is a very strong potential that all this evidence had potential impeachment value upon at least one possible witness, if not more." The Defendants maintained that if the trial court did not grant their motion, then they were entitled to a spoliation-of-evidence instruction based on Chief Deputy Flowers's intentional destruction of evidence.

¶54. In response, the State argued that the Defendants' claims regarding the preservation of evidence did not rise to the level of a due process violation.

¶55. After hearing arguments from counsel, the trial court denied the motions for a mistral and dismissal. In applying the relevant factors for destruction or spoliation of evidence, the trial court found "[t]here is no clear indication that any of the evidence that is no longer available possesses any exculpatory value." The trial court explained that the discovery made available by the State did not indicate that any statements or information from Tasha and Vanquilla would have been exculpatory concerning the murder and robbery at issue. As to whether the evidence was of such a nature that the Defendants would be unable to obtain comparable evidence by other reasonably available means, the trial court weighed this prong heavily—but not fully—in favor of the Defendants. The trial court explained that no one had presented any evidence to show that Tasha and Vanquilla were unavailable to be interviewed. Finally, the trial court found no evidence to show that Chief Deputy Flowers destroyed the evidence in bad faith. The trial court acknowledged that Chief Deputy Flowers did misplace, lose, and even destroy some evidence, but the trial court determined that this was a result of

21

the passage of time and not a deliberate effort to destroy evidence.

¶56.    After reviewing the record, we find that the trial court did not abuse its discretion in denying the motion for a mistrial or dismissal. Eloby failed to show that the evidence at issue possessed apparent exculpatory value. Regarding Chief Deputy Flowers's interviews with Tasha and Vanquilla, Eloby presented no evidence to show that they were unavailable to be interviewed; accordingly, Eloby failed to show that he was unable to obtain comparable evidence by other reasonably available means. Finally, the record contains no evidence that Chief Deputy Flowers destroyed any evidence in bad faith. *Robinson*, 247 So. 3d at 1234 (¶56). Eloby has not proved a violation of his due process rights.

### IV.    Speedy Trial

¶57.    Eloby argues that he was denied his right to a speedy trial. "The United States and Mississippi Constitutions guarantee criminal defendants the right to a speedy trial." *Newell v. State*, 175 So. 3d 1260, 1269 (¶9) (Miss. 2015) (citing U.S. Const. amend. VI; Miss. Const. art. 3, § 26 (1890)).[5] When examining whether a defendant's right to speedy trial was violated, we apply the four-part test developed by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514 (1972). *Newell*, 175 So. 3d at 1269 (¶9). The *Barker* test requires consideration of the following factors: "(1) the length of delay; (2) the reason for delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether the defendant has been prejudiced by the delay." *Id*. (citing *Barker*, 407 U.S. at 530-33). The *Barker* Court

---

[5] Eloby does not raise a challenge to his statutory right to a speedy trial.

explained that the four factors are "related factors and must be considered together with such other circumstances as may be relevant." *Id*. at 533.

¶58. Eloby filed a notice of demand for a speedy trial in May 2021. He also moved to dismiss his indictment due to the alleged speedy trial violation. After a hearing, the trial court denied the motion.

¶59. "A trial judge's ruling on a speedy-trial claim encompasses questions of fact, including whether there was 'good cause' for a delay and whether the defendant has been prejudiced by any delay." *Berryman v. State*, 337 So. 3d 1116, 1126 (¶33) (Miss. Ct. App. 2021) (quoting *State v. Woodall*, 801 So. 2d 678, 680-81, 687 (¶¶7, 29, 31) (Miss. 2001)). "We must affirm the trial judge's factual findings if they are supported by substantial, credible evidence," and "[w]e will reverse the trial judge's factual findings only if there is no probative evidence to support them and they are clearly erroneous." *Id*. (quotation marks omitted).

### 1. Length of the Delay

¶60. "The constitutional right to a speedy trial attaches when a person has been accused. Therefore, the speedy-trial clock begins running 'with the defendant's arrest, indictment, or information,' whichever occurs first." *Id.* at (¶34) (citation omitted) (quoting *Stark v. State*, 911 So. 2d 447, 450 (¶7) (Miss. 2005)). "'[A]ny delay exceeding eight months is presumptively prejudicial' and requires analysis of the remaining *Barker* factors." *Id*. at 1126-27 (¶34).

¶61.   Here, Eloby was arrested in July 2013 and was originally indicted in April 2015. The trial took place in January 2024. The delay in this case was greater than eight months; therefore, we find that the trial court correctly considered the remaining *Barker* factors in assessing Eloby's speedy trial claim.

### 2.     Reasons for the Delay

¶62.   "Once the delay is deemed presumptively prejudicial, the burden shifts to the prosecution to produce evidence justifying the delay and to persuade the trier of fact of the legitimacy of these reasons." *McBride v. State*, 61 So. 3d 138, 142 (¶9) (Miss. 2011). "This Court must then determine whether the delay is attributable to the State or the defendant." *Berryman*, 337 So. 3d at 1127 (¶36). "Different reasons for delay are assigned different weights." *Id*. "Deliberate attempts to delay the trial in order to hamper the defense are weighed heavily against the State." *Id*. However, "[d]elays caused by the defense, such as requests for continuances, will toll the running of the speedy-trial clock for the length of time attributable to the continuance." *Courtney v. State*, 275 So. 3d 1032, 1042 (¶27) (Miss. 2019). Likewise, "[a]greed continuances are weighed against the defense." *Id*. at 1042 (¶29).

¶63.   On appeal, the State maintains that the trial docket reflects that the majority of the delay is attributed to the Defendants' motions for continuance of the trial date. The record reflects that the Defendants were initially indicted on April 20, 2015. The Defendants filed approximately twelve motions for continuances, which the trial court granted on June 23, 2015; November 20, 2015; March 14, 2016; February 28, 2019; July 7, 2019; February 26,

2020; June 24, 2020; October 26, 2020; April 22, 2021; October 8, 2021; and February 10, 2022. The trial docket shows that over half of the orders granting continuances were agreed upon by the State. Eloby also filed a motion for a mental evaluation, which the trial court granted on February 24, 2016. No evaluation was performed, and Eloby withdrew the request in September 2023. In June 2017, Eloby filed a waiver of his speedy trial rights, and Eloby's case was passed to the inactive files, where it remained until the Defendants' 2021 indictment.

¶64. The motions for continuances were filed by, and granted to, Eloby and his co-defendants. This Court has held that "[g]enerally, continuances granted to a codefendant for good cause operate as good-cause delays as to jointly charged defendants." *Harris v. State*, 174 So. 3d 314, 319 (¶23) (Miss. Ct. App. 2015). On appeal, Eloby "offered no evidence that his codefendant's continuances were not for good cause." *Id*. Additionally, the record reflects that Eloby did not seek a severance from his co-defendants, nor did he object to the continuances. *See Bates v. State*, 886 So. 2d 4, 8 (¶11) (Miss. Ct. App. 2004) (finding that a defendant's failure to seek a severance or object to continuances granted to his co-defendant cut against the defendant's speedy-trial claim). And the Supreme Court has held that "delay attributable to obtaining a mental evaluation requested by the defense is not counted against the State." *Perry v. State*, 233 So. 3d 750, 757 (¶15) (Miss. 2017).

¶65. In its order denying Eloby's motion to dismiss, the trial court assessed this prong and held that "[t]he practical reality of the court's congested docket, Eloby's pending mental

evaluation and the (agreed) continuances should not be weighed against the State." The trial court properly found that the delays from the continuances and the pending mental evaluation should not be weighed against the State. *See Harris*, 174 So. 3d at 319 (¶24); *Perry*, 233 So. 3d at 757 (¶15). The period of time between Eloby's waiver of his speedy trial rights and his subsequent indictment likewise cannot be counted against the State.

### 3. Assertion of Right

¶66. "Although it is the State's duty to ensure that the defendant receives a speedy trial, a defendant has some responsibility to assert this right." *Taylor v. State*, 162 So. 3d 780, 785 (¶10) (Miss. 2015) (quoting *Bateman v. State*, 125 So. 3d 616, 630 (¶49) (Miss. 2013)). The Mississippi Supreme Court has held that "a defendant's failure to demand a speedy trial between his arrest and indictment is 'critical' to the analysis of a speedy-trial claim." *Id*. The Supreme Court has weighed this prong against a defendant where the defendant allows a "significant amount of time to pass after arrest before demanding a speedy trial." *Id*.

¶67. On appeal, Eloby maintains that he "consistently raised and preserved his speedy trial objection and filed a motion to dismiss on that ground," including his objection to the 2021 indictment as an alleged "attempt to sidestep the delay issue." He notes that he "unquestionably invoked his right to speedy trial following the new indictment, having waived the right" in 2017. Eloby did file a demand for a speedy trial in May 2021 and moved to quash the indictment due to the violation of his speedy trial right. However, the record does not contain any filings prior to the 2021 indictment, so if Eloby filed any speedy trial

26

demands prior to May 2021, it is not in the record before us. Although Eloby invoked his right to a speedy trial, it came after a lengthy delay. This factor is neutral.

### 4. Prejudice

¶68. "The final prong of *Barker* encompasses two aspects: actual prejudice in defending the case and interference with the defendant's liberty." *Bateman*, 125 So. 3d at 631 (¶51). "The three main considerations in determining whether the accused was prejudiced by a lengthy delay are: (1) preventing oppressive pretrial incarceration; (2) minimizing anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired." *Id.* (quotation marks omitted). The defendant "bears the burden of showing actual prejudice, since the defendant is clearly in the best position to show prejudice under this prong." *Reed v. State*, 191 So. 3d 134, 141 (¶19) (Miss. Ct. App. 2016) (quotation marks omitted).

¶69. Eloby argues that he was prejudiced by the delay "in multiple respects." He argues that the destruction of Chief Deputy Flowers's original notes and the inability to retrieve original recordings of witness statements materially impaired his ability to cross-examine, challenge, and impeach the State's evidence and witnesses. Eloby also asserts that the "faded memories" of key witnesses undermined the integrity of the fact-finding process. Finally, Eloby claims that he endured anxiety and suffered reputational harm while awaiting trial.

¶70. The State argues that none of Eloby's claims of prejudice arises to the level of actual prejudice under *Barker*. We agree and find that Eloby failed to meet his burden of showing

27

actual prejudice.

### 5. Summary of the *Barker* Factors

¶71. "In weighing the *Barker* factors, we must consider the 'totality of the circumstances,' and 'no one factor is dispositive.'" *Berryman*, 337 So. 3d at 1131 (¶53) (quoting *Price v. State*, 898 So. 2d 641, 648 (¶11) (Miss. 2005)).

¶72. Of the four *Barker* factors, only the length of delay in this case favors Eloby. As discussed, much of the delay in this case is attributed to the Defendants' motions for continuance of the trial date and Eloby's long-pending mental evaluation. Eloby did assert his right to a speedy trial but only after several years' delay. Finally, Eloby has not shown actual prejudice. Because we find no constitutional speedy trial violation in this case, we find that the trial court did not err in denying Eloby's motion to dismiss based on a speedy-trial violation.

### V. Admission of Gun Evidence

¶73. Eloby next asserts that the trial court abused its discretion by admitting the Taurus 9mm firearm into evidence, arguing that the gun was not relevant and created an impermissible inference that the gun tied to Eloby was connected to the crime. Eloby claims that this "created a substantial risk that the jury would infer guilt based on the mere existence of a similar firearm."

¶74. Eloby does not challenge Officer Nelson's testimony about the gun; he argues only that "[t]he trial court erred by allowing introduction into evidence a gun that could not be tied

28

to the crimes at issue." Despite Eloby's statement that the trial court "allowed the firearm into evidence over objection[,]" the transcript reflects that none of the Defendants objected to the admission of the firearm into evidence. Indeed, when the State moved to admit the gun as an exhibit, counsel for each Defendant affirmatively stated he had no objection to the evidence. "A defendant's failure to object to the admission of evidence at trial waives his right to raise the issue on appeal"; accordingly, we find that Eloby waived any argument regarding admission of the actual firearm into evidence. *Smith v. State*, 398 So. 3d 875, 890-91 (¶29) (Miss. Ct. App. 2023).

## VI.    Brown's Prior Bad Acts

¶75.    Eloby argues that the trial court erred by allowing Green to testify to co-defendant Brown's prior bad acts—that Brown had supplied weapons, driven to and from robberies, and scouted robbery targets—because the testimony was "overly prejudicial" and not related to a valid purpose under Mississippi Rule of Evidence 404(b). Eloby concludes that this testimony violated his right to a fair trial by unfairly prejudicing and misleading the jury.

¶76.    Generally, "evidence of other crimes, wrongs, or acts is prohibited to prove a person's character in order to show he acted in accordance with that character." *Culberson v. State*, 419 So. 3d 926, 940 (¶59) (Miss. Ct. App. 2025); MRE 404(b)(1). However, under Mississippi Rule of Evidence 404(b)(2), evidence of other crimes may be admissible "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." MRE 404(b)(2). Before a trial court admits

29

such evidence, the court "must find (1) the evidence is offered for a permissible purpose under Rule 404(b)" and (2) the evidence is admissible under Rule 403. *Parks v. State*, 228 So. 3d 853, 868 (¶58) (Miss. Ct. App. 2017).

¶77.   "Under Rule 403, when weighing admission of relevant evidence, a trial judge may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice." *Bowman v. State*, 283 So. 3d 154, 165 (¶39) (Miss. 2019) (quoting *O'Connor v. State*, 120 So. 3d 390, 398 (¶20) (Miss. 2013)). "The weighing and balancing task required by Rule 403 asks only that a judge rely on his/her own sound judgment." *Masters v. State*, 285 So. 3d 192, 197 (¶16) (Miss. Ct. App. 2019). We review a trial court's decision to admit evidence of a defendant's other crimes, wrongs, or acts for an abuse of discretion. *Bradshaw v. State*, 371 So. 3d 822, 836 (¶41) (Miss. Ct. App. 2023).

¶78.   We first note that Eloby's argument "does not fit squarely within the confines of Rule 404(b)(1)." *Terry v. State*, 412 So. 3d 1274, 1281 (¶30) (Miss. Ct. App. 2025). "The plain text of the Rule specifies that the prohibited uses of an individual's 'crimes, wrongs, or other acts' for purposes of proving character are confined to the acts of *that individual*, not others." *Id.* Thus, evidence of Brown's other prior bad acts was not and could not be admitted to prove Eloby's character or to show that he acted in accordance with that character.

¶79.   Eloby joined Brown's motion in limine to exclude evidence of his prior bad acts. At a hearing on the motion, the State argued that its evidence of Brown's prior bad acts would be used to prove "intent, preparation, motive, and plan and . . . modus operandi." The State

30

explained that Green would testify that the details of the shooting and robbery at issue are "identical" to subsequent crimes that Green and Brown had committed in other counties; namely, Green would testify that Brown was always involved in the preparation of the robbery and always drove to the location, and that Green and another person would always exit the vehicle and commit the robbery. The trial court denied Brown's motion and ruled that pursuant to Rule 404(b), the State could introduce evidence of Brown's criminal activity for the limited purposes of intent, plan, preparation, motive, and opportunity and "to tell a complete story of the events leading to the subject incident."

¶80.    At trial, Green testified that he was serving time for aggravated assault, kidnapping, robbery, and attempted robbery, all of which arose from crimes that occurred approximately a month after the shooting and robbery in this case. Green testified that Brown was also involved in those crimes. Green testified that Brown gave him "information and the spot" for a robbery on September 7, 2012, in Tallahatchie County, which Brown had also done for the Williams robbery and shooting. Green also testified that Brown provided "[i]nformation, transportation, and weapon and mask" for a robbery on September 11, 2012, in Leflore County, which Brown had done for the Williams robbery and shooting. Green testified clearly that neither Eloby nor Jones were involved in either of the September 2012 crimes.

¶81.    At the conclusion of Green's testimony, the trial court gave the jury the following limiting instruction:

> Members of the jury, the Court allowed evidence of other robberies allegedly committed by Defendants Green and Brown to be admitted into evidence in

31

this case. You may consider this evidence only as to Defendants Green and Brown for the limited purpose of intent, plan, preparation, motive, and opportunity. You may not infer that they acted in conformity with the prior acts or that they are, therefore, guilty of the charge for which they are presently on trial. **You cannot, and must not, consider the evidence against the defendants who did not participate in these other robberies**.

(Emphasis added).

¶82. Green's testimony was not used for a Rule 404 purpose as to Eloby—the State took great care during Green's testimony to ensure that the jury knew Eloby and Jones were not involved. Still, all evidence "must pass through Rule 403, which is the 'ultimate filter through which all otherwise admissible evidence must pass.'" *Stone v. State*, 94 So. 3d 1078, 1089 (¶34) (Miss. 2012) (quoting *McKee v. State*, 791 So. 2d 804, 810 (¶22) (Miss. 2001)). The trial court considered Rule 403 and concluded that the evidence's probative value was not substantially outweighed by unfair prejudice. The trial court also instructed the jury that the evidence regarding the other robberies was admitted for a limited purpose as to Brown and that it could not be considered at all as to Eloby or Jones. We find no abuse of discretion.

### VII. Cumulative Error

¶83. Eloby's final argument is that his conviction should be reversed based on cumulative error. However, Eloby has not identified any error at trial. The cumulative error doctrine is inapplicable. *Johnson v. State*, 404 So. 3d 143, 166 (¶69) (Miss. Ct. App. 2024).

### CONCLUSION

¶84. Eloby's convictions and sentences are **AFFIRMED**.

**BARNES, C.J., CARLTON AND WILSON, P.JJ., McDONALD, LAWRENCE,**

**McCARTY, EMFINGER AND WEDDLE, JJ., CONCUR. WESTBROOKS, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**